## DIXON v. THE STATE.

1. Where error is assigned to the charge as a whole, such assignment will not be considered if it appears that any part of the charge complained of was legal.

2. To sustain a verdict of guilty, when the offense charged is not one arising from culpable negligence, it is necessary that intention should exist at the time of the commission of the act; and it was therefore error in the judge, on the trial of a person accused jointly with others with the offense of riot, to charge that "when two or more persons unite, with or without a common intent, in doing an unlawful act, the acts and words of each one become the acts and words of every other one engaged."

3. To sustain a conviction of one charged with the offense of riot, it is necessary that the evidence should show the joint action of at least two persons, with a common intent to do an unlawful act of violence, or other act in a violent and tumultuous manner. This not being shown by the evidence in this case, the verdict is contrary to the law and the evidence, and a new trial should therefore have been granted.

Argued November 8, 1898.     Decided November 18, 1898.

Indictment for riot. Before Judge Harris. City court of Cartersville. September term, 1898.

*James B. Conyers, T. W. Milner* and *Ben. J. Conyers,* for plaintiff in error.

*Sam. P. Maddox, solicitor-general,* contra.

LITTLE, J. The plaintiff in error was jointly indicted with Lucius Goodwin, Gene Hamilton and Ike Sanders, for the offense of riot, by the grand jury of Bartow county. It is alleged in the bill of indictment that the persons named did, in a violent and tumultuous manner, gather and assemble together, and being so assembled, in a violent and tumultuous manner did do an unlawful act of violence by cursing, and urging John Dixon Jr. to shoot Cliff Johnson, and preventing a gun from being taken from John Dixon Jr., who was threatening to shoot the said Cliff Johnson; and did otherwise act in a violent and tumultuous manner. The State placed the plaintiff in error on trial, and on arraignment he pleaded not guilty.

The evidence, briefly stated, was as follows: Cliff Johnson testified: In the month of April there was a disturbance in Kingston in front of the storehouse of Hill, which was the furthest store on the east side of town. A number of negroes and white people assembled on the sidewalk and street in front of the store. There was loud and boisterous talking and some cursing. Heard Lucius Goodwin say he would kill "the God damn rascal" if he did him that way. I heard Gene Hamilton say, "If it had been me I would do him up." I heard John Dixon Sr. say, "Anybody who would strike my son had better first step into hell." Do not remember anything else that was said. The first time I saw John Dixon Jr. that night, Reynolds, Nance and myself were together near Griffin's store, just west of Hill's store and on the same side of the street. Dixon Jr. passed us. We went on behind him as far as Hill's store. There Reynolds and Nance stopped. Dixon was about forty feet beyond, and I called him to stop, and went to where he was. In a few moments I returned and went into Hill's store. Soon after I went in, Dixon Jr. came to the front door with a gun, and attempted to enter. He was by himself, and Davidson, a negro who was at

the front of the store, prevented him from going in, and took him down towards the store of Griffin. The witness, in company with Reynolds, then went into the back room of Hill's store and remained there until the fuss was over. While in the back room a considerable crowd of people assembled in front of the store. It was then witness heard the loud talking and threats to which he testified. Witness further stated: I do not know that any one of the persons at the front of the store made any attempt to enter the store, or that any of them did any act other than talking, as stated. He recognized the men who did the talking by their voices. Ed. Bruce testified: Remembers the disturbance in the month of April last. Before the difficulty Hill and myself were sitting on the steps of the store of the former. While there Dixon Jr. passed along going toward Sanders's shop. A short time after, Johnson, Reynolds and Nance came by, following him. The two latter stopped in front of the store. Johnson called to Dixon to stop, and walked toward him. Witness then heard noise, as if licks were struck. Johnson had a stick in his hand when he passed. He returned in a few minutes and walked into Hill's store. A little while after that John Dixon Jr. ran by the store and up an alley, crying. In a few minutes the accused came along following his son, and went on towards Griffin's store, calling his son. In a very short time Dixon Jr. came to the store with a gun and started to enter it, saying, "Where is he?" Another negro by the name of Davidson was standing at the front door when Dixon Jr. came up, and took hold of him, prevented him from entering the store, and took him down the sidewalk towards Griffin's store; and very soon a crowd assembled in front of Griffin's store. Then the crowd of negroes and white people came up in front of Hill's store, numbering ten or fifteen. · Among those I recognized Dixon Jr., Dixon Sr., Lucius Goodwin, Gene Hamilton and Ike Sanders. I heard the accused say, "Why didn't he hit me? He is mad with me. Why did he jump on my son?" I heard Hamilton say, "If he had done me that way I would do him up." I heard Lucius Goodwin say, "If he had done that way to me I would have killed the damn rascal." Does not recollect to have heard any of the others say anything. None of them made any

effort whatever to enter the storehouse of Hill. Johnson, at that time, was in the back room of Hill's store with Reynolds. Hill came to the front door of his store and said to the crowd that none of them were coming in there to have any fuss, and the crowd immediately dispersed. Hamilton had a knife in his hand whittling when I saw him. I saw no act of any of the parties other than as stated. None of them made any effort to go into the store. While Johnson was in the store he was scared, was white and trembling. Hill, sworn for the State, testified: Remembers the difficulty in Kingston last April. Bruce and myself were sitting on the steps of my store when Dixon Jr. passed by, about dark, going towards Sanders's shoe-shop. Soon after he passed, Johnson, Reynolds and Nance came up following him. Nance and Reynolds stopped, Johnson called to Dixon to stop, and went on eastward. I heard a noise as if licks were struck where Johnson and Dixon were. Immediately Johnson came back and walked into the store. About that time, was called into the store to wait on a customer, and soon after, John Dixon Jr. came to the front door with a gun, by himself, and started to go into the store. Davidson took hold of him and prevented him from coming in, and took Dixon off towards Griffin's store. Soon afterwards a crowd assembled in front of the store, and there was some loud talking. I went out on the porch and told them I wanted no difficulty there and none of them could enter my store; and while there I saw Dixon Jr., the accused, Gene Hamilton, Goodwin and Sanders. Hamilton had a knife in his hand whittling. None of them made any effort to come into the store, and all went off when I told them I wanted no trouble at my store. They went, as I thought, in the direction of Griffin's store. John Dixon Sr. was in the crowd, and I said, "Stand back, you are not coming in here." They were mad, and there was considerable excitement. Will Bruce, sworn, testified: I remember the difficulty. I was at my place of business, west of Griffin's store, when I heard a noise and came out and walked to the front of Griffin's store, where there was a considerable crowd, white and colored. Dixon Jr. was in the crowd and had a gun. His mother was there, and a negro by the name of Sanders. It was my purpose to take the gun from the

boy, and Sanders said, "If we want the gun taken away from him we can take it; there is enough of us here to do it." I then said, "Take it"; and immediately Sanders took the gun away from the boy. Then Sanders, the boy and his mother went off in the direction of Sanders's shop. I went to Hill's store and saw a number of people in front of the store, who were then scattering. There I met the accused, and he and I walked on together towards the depot. The accused and his son were employed at the W. & A. Railroad depot.

Nance testified that Reynolds, Johnson and himself were together, and Dixon passed, and while witness and Reynolds stopped at Hill's store, Johnson called Dixon to stop and went to where he was. Heard a noise as if some one was striking, and heard Dixon crying. Johnson returned to Hill's store and went in. He further testified: I went into the store and remained near the porch. Very soon I heard the accused and his son John coming from towards Sanders's shop, and just before they got in front of Hill's store I heard Dixon Jr. say to his father, "He's got a gun"; and his father said to him, "You go and get one too." And when they got in front of the store I heard the accused say, "Anybody who hits my son had just as well jump into hell." Then I think Dixon Jr. went up the alley, and the old man went down towards Griffin's store. About five minutes afterwards Dixon Jr. came to the front of Hill's store with a gun and attempted to enter, asking, "Where is he? I will put two loads in him." Davidson took hold of him and prevented him from entering the store, and took him down towards Griffin's store. Very soon a crowd assembled on the sidewalk in front of Hill's store. There were present the accused, John Dixon Jr., Lucius Goodwin, Gene Hamilton and Sanders. Hamilton had a knife in his hand, whittling. I heard him say, "If he had done that to me I would have killed the God damn son of a bitch." There was a good deal of loud talking and some cursing. Hill came out and said to the crowd that none of them could enter his store, that he did not want to have any fuss there; and very soon the crowd dispersed. None of them made any effort to enter the store. All remained in front of the store on the sidewalk and in the

street. The parties mentioned were very mad and there was considerable excitement.—This was all the evidence for the State. The evidence on the part of the defendant did not materially differ from that of the State. Some of the witnesses for the defendant contradicted the statements made by the witnesses for the State as to what was said at the time. Sanders testified that he took the gun away from Dixon Jr. at Griffin's store. Dixon Jr. testified that after he was stricken he went home, got his gun and returned to Hill's store alone, and was not in the crowd afterwards, in front of the store, except in passing. The accused, in his statement, denied having anything to do with any disturbance. After the jury were charged, they returned a verdict of guilty, and the plaintiff in error made a motion for new trial on certain grounds, which was overruled, and he excepted. A number of assignments of error set out in the motion for new trial, in view of our ruling hereafter made, we do not find it necessary to pass upon, as the case is controlled in favor of the plaintiff in error for the reasons herein given.

1. One of the grounds of the motion for new trial alleges error on the charge given as a whole. Under repeated rulings of this court, it must appear, before this ground can be sustained, that the entire charge was error. It does not appear to be such in this case; and there was no error in overruling the motion for new trial on this ground.

2. Error is also assigned upon the following charge of the judge: "I charge that when two or more persons unite, with or without a common intent, in doing an unlawful act, the acts and words of each one become the acts and words of every one engaged in it. And if you find that there was any assembly to do an unlawful act of violence on this occasion, or to do any other act in a violent or tumultuous manner, and that this defendant was engaged in it, then it is immaterial whether the riotous act, if there was one, is done by one or another of the participants; each one is responsible." This charge, we think, is error. Without intention or criminal negligence no act becomes a crime. It is not necessary to look beyond the circumstances connected with the perpetration of the offense to ascer-

tain intention; because every person is presumed to intend the natural and necessary consequences of his act. Penal Code, § 32. But intention or criminal negligence must always exist, to support a conviction for an offense against the law.

It is declared by our law that "If two or more persons do an unlawful act of violence, or any other act in a violent and tumultuous manner, they shall be guilty of a riot and be punished as for a misdemeanor." Penal Code, § 354. And when done, the riot, although it must be the act of at least two per-sons, is but one offense. *Jacobs* v. *State,* 20 *Ga.* 841; *Rachels* v. *State,* 51 *Ga.* 374-5; *Stafford* v. *State,* 93 *Ga.* 207. Such offense is a joint one, and one person alone can not be indicted. *Robinson* v. *State,* 84 *Ga.* 680. Under the provisions of the Code of 1882, §5414, which gives the definition and prescribes the punishment for the offense of riot, it was declared that "If any two or more persons, either with or without a common cause of quarrel, do an unlawful act of violence, or any other act in a violent and tumultuous manner," such person would be guilty of a riot. It will be noticed that the codifiers eliminated from the definition of riot, as it appears in the Code of 1895, the words, "with or without a common cause of quarrel"; and very properly so, because if an unlawful act of violence, when done by two persons with a common cause of quarrel, was a riot, and if done in the same manner by two persons without a common cause of quarrel was a riot, then, whether they did or did not have a common cause of quarrel was immaterial, so far as the offense was concerned; and the section, after the words are stricken, means exactly the same thing as it did before they were stricken. It was for this reason, we apprehend, that the codifiers rejected the words as surplusage. In any event, the section is to be construed as it stands. Bu; eliminating the condition as to whether the persons doing the act had or did not have a common cause of quarrel in no possible way qualified the rule of law as to the intention necessary to hold one criminally responsible. Defining the offense of riot, the compilers of the American and English Encyclopædia of Law, citing a number of cases and eminent authors, define riot to be, "a tumultuous disturbance of the peace by three

persons or more, assembling together of their own authority, with an intent mutually to assist one another against any who shall oppose them, in the execution of some enterprise of a private nature, and afterward actually executing the same in a violent and turbulent manner, to the terror of the people, whether the act inflicted were of itself lawful or unlawful." (Vol. 21, p. 408.) At common law, and in most of the States, a riot can not be committed without the joint action of at least three persons. In Illinois and Georgia the number of persons necessary to commit this offense has been changed by statute to two. In the definition given it will be noted that an intent must exist as an essential ingredient of the offense. Owing to the character of the offense and the fact that it requires the joint action of more than one person, the intent is that of mutually assisting each other against any who shall oppose them in the execution of some enterprise. According to Mr. Desty, in his work on American Criminal Law (§ 98 a), the necessary intention in the offense of riot is, to materially assist each other against all opposition, and putting their design into execution in a violent manner, whether the object be lawful or unlawful. Mr. Bishop, in his work on Criminal Law (New Cr. L., vol. 2, § 1150), says: "It is the doctrine of the law, beyond dispute, that a riot is an unlawful assembly carried to the extent of actually doing the thing contemplated; but the result does by no means follow that there must be an appreciable space of time between the creation of the unlawful assembly and its proceeding to perpetrate the ulterior wrong. If an assembly, however innocent the original coming together, does riotous things, then all present and concurring in the things constitute themselves, by the fact itself, an unlawful assembly; and not the less so because the hand moves simultaneously with the moving of the mind." It is not necessary, however, to go beyond the decisions of our own court on this question. In the case of *Prince and Stafford* v. *State,* 30 *Ga.* 27, this court held: "A riot can not be committed without as many as two persons acting in execution of a common intent." In delivering the opinion in that case, Stephens, J., gives a very lucid and satisfactory explanation of such common intent, in the follow-

ing language: "There must be as many as two persons, and they must do the same act. To be sure, it is not necessary that they should do the same act in the sense that what each one does must be identical with what is done by each of the others. If so, a riot is an impossibility; for it is impossible that the action of each shall not have a certain individuality which will distinguish it from the action of all the rest. In tearing down a house, for instance, one rioter breaks down a door, and another breaks down a window, and a third merely hands a crowbar to one of his associates. Here each one's act is different from the acts of the others, and the act of one of them has in it nothing of violence. But there is an obvious legal sense in which they all *do the same act.* The *common intent,* which covers all the individual parts in the action, cements those parts into one whole, of which each actor is a responsible proprietor. The part performed by himself is his by perpetration, and the parts performed by the others, *in execution of the common intent,* are his by adoption. The principle is, that each one adopts the performances of all the rest and adds them to his own, and thus does the whole, in the sense of the definition, so long as they are acting in execution of a common intent, but *no longer."* To the same effect, see *Stokes* v. *State,* 73 *Ga.* 816, and *Stafford* v. *State,* 93 *Ga.* 207. Under the authorities cited, it is necessary, to sustain a conviction for riot, that the persons doing the unlawful act must have done the same with a common intent, that is, a common intent to do an unlawful act; and as ruled in the case of *Prince and Stafford,* supra, when engaged in the execution of the unlawful act, each adopts the particular parts of such act done by the others. But without a common intent to do one of the acts inhibited by the statute, a conviction for riot can not be sustained. It follows that the court erred in the charge to the jury, of which complaint is made.

4. Other grounds of the motion assign as error the refusal of the court to grant a new trial because the verdict is contrary to law and contrary to evidence. Inasmuch as, under the law governing this offense, it requires the joint action of at least two persons acting with a common intent in doing an unlawful act of violence, or any other act in a violent and tumultuous

manner, and the evidence fails to disclose any unlawful act of violence done, or any other act in a violent and tumultuous manner, by the plaintiff in error jointly with any other of the persons charged; the conviction can not be sustained.   It is not to be understood that in so ruling this court upholds or approves the action of John Dixon Jr. in attempting to enter the storehouse of Hill with his gun, nor the words or threats of other parties, as appear in the record in this case.   Whatever may have been the grievances of Dixon, he was not authorized by law to attempt to use his gun in the manner shown by the evidence; nor was the conduct of the other parties, who were shown to have used the vile and profane language detailed in the evidence, to be approved.   But, however culpable these several parties may have been and are, we can not, in the absence of evidence showing a common intent in doing an unlawful act of violence, sanction the conviction of the offense of which the plaintiff in error is charged.   It is a requirement of the law that this common intent should prevail at the time of the execution of the act.   The judgment of the court below in refusing to grant a new trial is

*Reversed.   All the Justices concurring, except Simmons, C. J., and Lumpkin, P. J., absent.*