NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| PATRICK DALE BURTON-HILL, JERALD DWAYNE BURTON JR., and MARCUS DJAUN HOWARD, | Court of Appeals Nos. A-13223, A-13262, and A-13263 Trial Court Nos. 4FA-18-00521 CR, 4FA-18-00520 CR, and 4FA-18-00525 CR (respectively) |
| Appellants, | |
| v. | O P I N I O N |
| STATE OF ALASKA, | |
| Appellee. | No. 2802 — April 4, 2025 |

Appeal from the Superior Court, Fourth Judicial District, Fairbanks, Bethany S. Harbison, Judge.

Appearances: Margot Knuth and Marilyn J. Kamm, Attorneys at Law, Anchorage, for Appellant Burton-Hill; Michael Horowitz, Law Office of Michael Horowitz, Kingsley, Michigan, for Appellant Burton; and Elizabeth D. Friedman, Law Office of Elizabeth D. Friedman, Prineville, Oregon, for Appellant Howard — all under contract with the Office of Public Advocacy. Eric A. Ringsmuth and Donald Soderstrom, Assistant Attorneys General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, Wollenberg, Judge, and Mannheimer, Senior Judge.[*]

Judge MANNHEIMER.

The three defendants in this consolidated appeal were among a group of inmates who participated in a disturbance in the "A Wing" of the Fairbanks Correctional Center in August 2017. In a joint trial, these three defendants were each convicted of two felonies: the crime of riot as defined in AS 11.61.100(a), and the crime of third-degree criminal mischief as defined in AS 11.46.482(a)(1) (*i.e.*, intentional and unlawful destruction of property valued at $1000 or more).

Alaska's riot statute, AS 11.61.100(a), declares that a defendant commits the crime of riot if, "while participating with" five or more other people, the defendant engages in conduct that is both "tumultuous" and "violent", and thereby causes, or creates a substantial risk of causing, physical injury to persons or damage to property.

For the reasons explained in this opinion, we conclude that the jury instructions at the defendants' trial materially misstated two elements of the riot statute: the element of "participating with five or more others" and the element of "tumultuous" conduct. We further conclude that these errors are not harmless beyond a reasonable doubt — *i.e.*, there is a reasonable possibility that the jury's verdicts on the charge of riot would have been different if the jurors had correctly understood these elements of the crime. We therefore reverse the defendants' convictions for riot.

(We also have concerns regarding the jury instruction and the prosecutor's arguments to the jury regarding the element of "violent" conduct, but we need not resolve those concerns in the present case.)

---

[*] Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

There were also material flaws in the jury instructions dealing with the charge of criminal mischief. The defendants were charged with third-degree criminal mischief under AS 11.46.482(a)(1) for intentionally causing at least $1000 of damage to prison property. This crime is a "specific intent" crime: under the statute, the government was not only required to prove that the defendants engaged in actions that caused damage to prison property but also that, when the defendants engaged in these actions, the defendants did so with the *conscious goal* of damaging this prison property.

At trial, the prosecutor acknowledged that there was no evidence that the three defendants personally damaged any prison property during the disturbance. However, the prosecutor argued three theories as to why the defendants were vicariously liable for damage to prison property that was caused by other people.

First, the prosecutor argued that the defendants were vicariously liable, as aiders or abettors, for the approximately $1000 of property damage that was allegedly caused by a fellow inmate, Robert Gentleman.

Second, the prosecutor argued that the defendants were vicariously liable for the approximately $2430 of property damage that was caused by the law enforcement officers who responded to the disturbance in the A Wing. The prosecutor's theory was that the three defendants "caused" all this damage (in the eyes of the law) because they refused to leave the A Wing when they were ordered to do so. The prosecutor argued that the inmates' refusal to leave was the reason that the law enforcement officers used force to re-establish control over the A Wing, and the officers' use of force resulted in various types of damage to prison property.

The prosecutor's third theory was an expanded version of this second theory. The prosecutor argued that even if the defendants were not personally complicit as aiders or abettors in any of the damage to prison property, the defendants were nevertheless criminally responsible for *all* of the property damage that occurred here —

– 3 –                                          2802

not just for the property damage caused by the law enforcement officers, but indeed for any and all property damage that occurred during the disturbance in the A Wing, regardless of who caused this damage, or how it was caused. Again, the prosecutor's theory was that the three defendants (and all of the other inmates who refused to leave the A Wing) "caused" all this damage simply by refusing to leave the A Wing when they were ordered to do so — because the inmates' refusal was the event that set everything else in motion.

As we will explain in this opinion, the jurors could not properly evaluate the prosecutor's second and third theories of vicarious liability unless they received instruction on the criminal law doctrine of "proximate" or "legal" causation, so that they could apply that doctrine to the particular facts of this case. But the jurors received no instruction on proximate causation.

In addition, leaving aside the question of whether the three defendants' refusal to leave the A Wing was a proximate (legal) cause of the property damage inflicted by the law enforcement officers, the defendants could not properly be convicted of criminal mischief based on this property damage unless the State additionally proved that, when the defendants refused to leave the A Wing, they did so with the conscious goal of having law enforcement officers and other inmates inflict all this damage.

This issue — the question of the defendants' intent or lack of intent to damage prison property — was one of the major issues contested at the defendants' trial. And with regard to the property damage allegedly caused by fellow inmate Robert Gentleman, the State introduced evidence tending to show that the defendants actively aided or abetted Gentleman (apart from merely refusing to leave the A Wing).

But with regard to all the other property damage in this case, the State presented no evidence that the three defendants actively aided or encouraged the law enforcement officers or the other inmates to engage in acts of property damage. Instead,

the prosecutor relied on the argument that (1) it was reasonably foreseeable that one or more types of prison property would be damaged if the inmates refused to leave the A Wing, and therefore (2) the three defendants (and all the other inmates who refused to leave) must have acted with the conscious objective of causing all of the property damage that occurred here, no matter how the damage was caused and no matter who caused it.

On the face of it, the prosecutor's premise (that some damage to prison property was reasonably foreseeable) does not lead to the prosecutor's suggested conclusion (that the three defendants must have consciously intended to cause all of the ensuing property damage). The prosecutor's argument appears to rest on a confusion between negligence and intent. But the trial court gave the jurors an instruction that endorsed and ratified the prosecutor's argument.

This instruction told the jurors that it was reasonable for them to infer that people "ordinarily" intend the "natural and probable consequences" of their actions. In the factual context of this case, this instruction told the jurors that if they concluded (in retrospect) that the various types of property damage that occurred in this case were all "natural and probable consequences" of the defendants' refusal to leave the A Wing, then this fact alone was legally sufficient to justify the jurors in finding, not just that the defendants acted negligently with respect to this property damage, but that the defendants acted with the *conscious goal* of causing all of this property damage.

When, in retrospect, one can see that a particular unlawful result was a foreseeable consequence of a defendant's actions, this fact is proof of the defendant's negligence, not proof of the defendant's conscious intention. But here, the trial court improperly told the jurors that if they concluded that the defendants acted negligently with respect to the property damage in this case, this would "ordinarily" justify the jurors in finding that the defendants acted intentionally with respect to all of this property

– 5 –                    2802

damage — even if the State failed to introduce any other evidence that the defendants consciously intended for these various types of property damage to occur, or any evidence that the defendants were even subjectively aware of the risk that these types of property damage might occur.

Because of these two flaws — the absence of any instruction on proximate (legal) causation, and the erroneous instruction on the question of the defendants' intent — we reverse the defendants' convictions for criminal mischief.

*The factual background of this case*

On the morning of August 17, 2017, the three dozen inmates living in the A Wing of the Fairbanks Correctional Center were informed that they were going to be moved to another module of the correctional center that same afternoon. Many of the inmates objected to this move, and they tried to speak to the on-duty shift supervisor about their concerns, but the shift supervisor told the inmates to return to their rooms in the A Wing and prepare themselves for the move — because the prison administrators were not going to call off the move, and those administrators did not intend to actively consider the inmates' objections until after the move was completed.

The inmates returned to the A Wing but, a little before noon, a group of inmates gathered behind the main gate to the A Wing and began to shout statements of defiance to the corrections officers on the other side of the gate — declaring that they did not intend to leave the A Wing, and threatening the officers with harm if they entered the A Wing and tried to force the inmates to move.

(This main gate was a sliding gate constructed of bars, so the inmates and the corrections officers could see and hear each other through the gate, even though the inmates were physically separated from the officers and could not reach them.)

Corrections staff gave the A Wing inmates several opportunities to leave the wing if they did not wish to be involved in this disturbance, and many of the inmates voluntarily surrendered themselves. But more than a dozen inmates chose to stay.

These remaining inmates anticipated that corrections officers would enter the A Wing and forcibly remove the protesting inmates from the wing, so they began preparing to obstruct the officers' entry. Some inmates poured water and shampoo on the floor of the main corridor to make the surface slippery. Some inmates tried to jam the entry gate shut by wedging blankets and small objects underneath and around the gate, so that it could not slide open.

Some inmates opened the cell doors on either side of the A Wing corridor and used sheets and blankets to tie each cell door to the corresponding door on the other side of the corridor. These pairs of tied cell doors were not wide enough to touch each other and completely block the corridor, but they created a series of barriers that narrowed the A Wing corridor to the width of a single person — making it more difficult for the officers to move through the corridor as a group, and obstructing the officers' view of what the inmates were doing along the sides of the corridor behind the doors.

In addition, some inmates covered the prison surveillance cameras with opaque material (and, in one instance, an inmate destroyed one of the surveillance cameras), so that corrections officers could no longer observe the inmates' activities from their control center on the other side of the A Wing gate.

While these actions were occurring, many inmates wrapped towels around their faces to help protect themselves from the pepper gas and other chemical irritants that they anticipated would be deployed against them.

In the meantime, corrections officials summoned the Fairbanks "Special Operations Response Team" (SORT) — a multi-agency team equipped with both lethal and non-lethal weapons, as well as shields and body armor. This team, together with a

number of corrections officers, prepared to enter the A Wing and quell the disturbance. Before the team opened the gate to the A Wing, they fired dozens of non-lethal rounds of chemical agents into the A Wing, both to clear any inmates from the immediate vicinity of the gate and to incapacitate all of the protesting inmates. After waiting for these chemical agents to take effect, the corrections officers slid open the gate, and the SORT team began moving slowly down the corridor of the A Wing.

Despite the threats that some of the inmates had made earlier, the SORT team and the corrections officers who accompanied them into the A Wing encountered no resistance as they moved down the corridor. All of the protesting inmates retreated to their cells soon after the officers entered the A Wing, and all of the inmates were subdued and restrained without further incident. No fighting occurred, and no officer or inmate was injured.

As a result of this episode, thirteen A Wing inmates (including the three defendants in this case) were indicted on charges of riot and third-degree criminal mischief. The three defendants in this case went to trial together, and each of them was convicted of these two crimes.

*Overview of the defendants' claims on appeal*

The three defendants claim (on a number of bases) that they were improperly convicted of riot and criminal mischief.

Of the defendants' various arguments pertaining to their riot convictions, the most consequential are the defendants' claims that the jury was improperly instructed on three elements of this crime as set forth in Alaska's riot statute, AS 11.61.100(a). This statute declares that a person commits the crime of riot

if, while participating with five or more others, the person engages in tumultuous and violent conduct in a public place and thereby causes, or creates a substantial risk of causing, damage to property or physical injury to a person.

The individual defendants raise different claims on appeal. But among the three of them, they raise claims that the trial court misinterpreted the riot statute with regard to (1) what it means for a person to "participate with" five or more others, (2) what it means for conduct to be "tumultuous", and (3) what it means for conduct to be "violent".

Two of the defendants (Burton and Burton-Hill) characterize several of their arguments as claims that the State presented "insufficient evidence" to support their riot convictions. But the legal character of a pleading or a claim is determined by its substance, not by how it is labeled.[1] And the gist of the defendants' claims is that the trial jury's verdicts were based on a mistaken understanding of the elements of riot.

For example, Defendant Burton argues that the evidence was "insufficient" to support his riot conviction because, contrary to the trial court's jury instructions, Alaska's riot statute not only requires proof that six or more people engaged in tumultuous and violent conduct at the same time, but also proof that these people were acting in concert.

Similarly, Defendants Burton and Burton-Hill argue that the evidence was "insufficient" to support their riot convictions because (1) even though the evidence may have supported a finding that *other* inmates engaged in violent conduct during the disturbance, the evidence did not support a finding that Burton and Burton-Hill themselves engaged in violent conduct, and (2) the statutory definition of riot required

---

[1] *Shorthill v. State*, 354 P.3d 1093, 1113 (Alaska App. 2015); *Crawford v. State*, 337 P.3d 4, 15 (Alaska App. 2014).

the State to prove that each named defendant personally engaged in tumultuous and violent conduct.

We will therefore treat these arguments, not as sufficiency-of-the-evidence claims, but rather as claims that errors occurred in the proceedings leading to the defendants' convictions — more specifically, errors in the definitions of "participating with five or more others", "tumultuous" conduct, and "violent" conduct.

(See our discussion of an analogous situation in *Collins v. State*, 977 P.2d 741, 748, 751–52 (Alaska App. 1999), where the defendant sought a "judgement of acquittal" because the jury was misinstructed on the elements of the charged crime. See also the discussion of the related issue in *United States v. Robison*, 505 F.3d 1208, 1224–25 (11th Cir. 2007), *United States v. Wacker*, 72 F.3d 1453, 1463–65 (10th Cir. 1996), and *United States v. Weems*, 49 F.3d 528, 529–531 (9th Cir. 1995).)

In this opinion, we will explain the legislative history of Alaska's riot statute. We will examine the common-law version of this offense, and then the provisions of the Model Penal Code and the Oregon Statutes which the drafters of Alaska's riot statute consulted when they formulated our current version of this offense. We will also examine the commentary written by the Alaska drafters. We will then explain why, based on this legislative history, we conclude that the jury in this case was misinstructed on the element of "participating with" five or more others and the element of engaging in "tumultuous" conduct.

We will also explain our concerns regarding the definition of "violent" conduct that the trial court relied on when it denied the defendants' motions for judgements of acquittal — a definition that was later included in the court's instructions to the jury, and on which the prosecutor relied when he argued the State's case at the close of the trial.

\* \* \*

The three defendants likewise claim that they were improperly convicted of third-degree criminal mischief as defined in AS 11.46.482(a)(1). This statute, in its 2017 form, declared that a person commits third-degree criminal mischief

> if, having no right to [damage another person's property] or any reasonable ground to believe [they have] such a right, ... [and] with intent to damage property of another, the person damages property of another in an amount of $1000 or more[.]

(The current version of this statute is the same in all respects except that the threshold amount of property damage has been lowered to $750.)

This statute defines the offense in terms of causing a particular result: the unlawful damaging of property belonging to another person in the amount of $1000 or more. But in addition to proving that a defendant's conduct caused this result, the State is required to prove that the defendant acted with the intent — *i.e.*, with the conscious objective — of damaging the other person's property.

(AS 11.81.900(a)(1) defines the concept of acting "intentionally" with respect to a result specified in the definition of a crime. This statute declares that a person acts "intentionally" with respect to the specified result "when the person's conscious objective is to cause that result", although this objective need not be the person's sole objective.)

At the conclusion of the trial in this case, the prosecutor acknowledged that there was no evidence that these three defendants personally damaged any property, but the prosecutor argued that the defendants were nevertheless vicariously liable for all the property damage that resulted from the disturbance in the A Wing. More specifically, the prosecutor argued these three theories of vicarious liability:

1. that the defendants were complicit, as aiders or abettors, in the property damage that was allegedly caused by their fellow inmate Robert Gentleman, and thus the defendants were vicariously liable for this damage under AS 11.16.-110(2)(B);

2. that the defendants were vicariously liable for the property damage that was caused by the law enforcement officers who responded to the disturbance in the A Wing (even though these officers committed no crime when they caused this damage) because this property damage was a reasonably foreseeable consequence of the defendants' refusal to leave the A Wing; and

3. that in any case, the defendants (and all the other inmates who refused to leave the A Wing when they were ordered to do so) set events in motion which ultimately resulted in several types of damage to prison property, and therefore the defendants were vicariously liable for *all* the property damage that ensued — regardless of who caused this damage, or what type of damage it was, or how the damage was caused, and even though the defendants were not complicit in this property damage as aiders or abettors under AS 11.16.110(2)(B).

With respect to the prosecutor's second theory of liability, the three defendants argued at trial — and they argue again on appeal — that they cannot properly be held liable for the property damage that was caused by the law enforcement officers. And with respect to the prosecutor's broader third theory of liability (the assertion that the defendants should be held vicariously liable for any and all property damage that occurred in this case), the defendants argue that the State failed to present sufficient evidence to support a finding that the defendants acted "intentionally" with respect to this property damage — *i.e.*, sufficient evidence that the defendants acted with the conscious objective of causing all the various types of property damage that occurred here.

In this opinion, we will explain why the prosecutor's second and third theories of vicarious liability raised substantial questions as to whether the defendants' refusal to leave the A Wing was a "proximate" or "legal" cause of the different kinds of property damage that occurred in this case. The trial court failed to give the jurors any instruction on the law of proximate causation, and we conclude that this omission was plain error.

The prosecutor's second and third theories of liability also raised substantial questions regarding the defendants' mental states when they refused to leave the A Wing. Even assuming that the defendants' refusal to leave the A Wing was a proximate cause of all the property damage that occurred in this case, the State was still required to prove that the defendants acted "intentionally" with respect to this property damage. That is, the State was required to prove that, when the defendants refused to leave the A Wing, they did so with the conscious goal of causing all of the property damage that was later inflicted by the law enforcement officers and the other inmates.

In this opinion, we will explain why the jury's consideration of this element of the crime was prejudiced by an improper jury instruction — an instruction which erroneously told the jurors that if the defendants acted negligently with respect to the various forms of property damage in this case, this fact alone would "ordinarily" justify the jurors in finding that the defendants acted with the *conscious goal* of causing all of this property damage.

## I. *The defendants' convictions for riot*

*The elements of the offense of riot at common law*

We begin our analysis by examining the elements of riot as this offense was defined at common law. We do this for two reasons.

First, when the legislature enacts a statute that codifies a version of a common-law crime, knowing the definition of that common-law crime can help to illuminate or clarify ambiguities or uncertainties in the language of the statute.

Second, the elements of common-law riot are important to our analysis of the riot statute because, under Alaska law, there is a presumption that applies whenever courts interpret a felony statute that codifies a version of a common-law crime. If the common-law crime required proof that the defendant acted with a particular intent, we must presume that the statutory version of this crime likewise requires proof that the defendant acted with this same intent, even when the wording of the statute does not explicitly require proof of this element. Under this presumption, unless the wording of the statute or the statute's legislative history affirmatively demonstrates that the Alaska legislature intended to depart from the common-law requirement of intent, the statute must be construed as requiring proof of this mental element.[2]

---

[2]  *See Tarnef v. State*, 512 P.2d 923, 929 (Alaska 1973); *Speidel v. State*, 460 P.2d 77, 79 (Alaska 1969) (when a statute codifies a common-law offense, "courts have assumed that the [statute's] omission of [a] requirement of criminal intent [does] not signify disapproval of [that element] but merely recognize[s] that intent was so inherent in the idea of the offense that it needed no statutory affirmation"); *Lee v. Anchorage*, 70 P.3d 1110, 1113 (Alaska App. 2003) (holding that, in the absence of an affirmative indication that the Anchorage municipal assembly intended to alter the common law when it codified the offense of maintaining a house of prostitution, the municipal ordinance should be interpreted to require the same

(continued...)

We therefore turn to the elements of riot as this offense was defined at common law.

The common-law offense of riot was a tumultuous and violent disturbance of the public peace by three or more persons acting together. More specifically, the offense of riot consisted of two distinct actions: (1) an "unlawful assembly", followed by (2) concerted action by three or more persons to commit a crime by open force or to accomplish any other goal, lawful or unlawful, "in such a violent, turbulent and unauthorized manner as to create [a] likelihood of public terror and alarm." Rollin M. Perkins and Ronald N. Boyce, *Criminal Law* (3rd edition, 1982), p. 483 & n. 31. See also 77 Corpus Juris Secundum, "Riot", § 1.[3]

To constitute a riot, the turbulent violence of the group had to be preceded by an "unlawful assembly". At common law, the term "unlawful assembly" did not refer to the broad idea of any unauthorized or trespassory gathering. Rather, it was a technical term: "unlawful assembly" meant a gathering of three or more persons who have mutually agreed (either explicitly or implicitly):

---

[2] (...continued)
culpable mental states that were required at common law: that the defendant "acted 'knowingly' with respect to the conduct of maintaining or operating a place of prostitution and that [the] defendant acted 'intentionally' with respect to the illegal use — that is, prostitution — of the premises maintained").

[3] "[R]iot is commonly defined as a tumultuous disturbance of the peace by three or more persons, assembled and acting with a common intent, either in executing a lawful private enterprise in a violent and turbulent manner, to the terror of the people, or in executing an unlawful enterprise in a violent and turbulent manner."

- to pursue a shared goal

- by jointly engaging in conduct which, if carried out, would constitute a riot — *i.e.*, a turbulent and violent attack on the persons or property of others, in a manner likely to cause reasonable people to apprehend a breach of the public peace,

- and to mutually assist each other against anyone who opposes their actions.

*Perkins and Boyce*, pp. 481–82 & 483–84.

See *Dixon v. State*, 31 S.E. 750, 753 (Ga. 1898) (explaining that the common-law offense of riot required proof that the minimum number of persons agreed to jointly engage in tumultuous and violent action, in breach of the public peace, while acting with "the intent ... of mutually assisting each other against any who shall oppose them in the execution of [their] enterprise"); *Commonwealth v. Abramms*, 849 N.E.2d 867, 876 (Mass. App. 2006) (the term "unlawful assembly" means "any gathering ... the members of which have formed a common intent to engage in a common cause ... to be accomplished with violence and in a tumultuous manner").

"Unlawful assembly" was itself a separate misdemeanor at common law. Thus, even if the would-be rioters never actually embarked on their planned turbulent and violent conduct, they could still be prosecuted for unlawful assembly. *Perkins and Boyce*, pp. 483–84. If, following an unlawful assembly, the participants left their place of assembly and were on their way to carry out their common design, this was the common-law offense of "rout". *Id.* at 482–83. And if the participants actually commenced their planned "tumultuous attack upon the persons or property of others", this constituted the offense of riot. *Id.* at 483–84.

The mutual agreement among the rioters (*i.e.*, the agreement to jointly assist each other in conduct of such turbulence and violence as to breach the public peace)

might occur on the spur of the moment, and this agreement might be tacit rather than express. Moreover, the interval between the rioters' reaching their mutual agreement and the rioters' commencement of their agreed-upon violent and turbulent conduct might potentially be quite short. But the mutual agreement had to precede the turbulent and violent conduct itself: "with whatever speed the plan was carried out, ... it must have been agreed upon *before* [it was] translated into action". *Perkins and Boyce*, p. 484 (emphasis added).

This common-law requirement of an antecedent agreement to jointly pursue a shared goal through turbulent, violent, and unauthorized conduct was particularly important in cases where a riot ensued after a group of people assembled for a *lawful* purpose, such as a town meeting or a peaceful public protest, and then some of the people participating in this lawful gathering formed an intent to riot. As explained in *Perkins and Boyce*,

> If the [gathering is] an unlawful assembly from the begin-ning, and [it] results in a riot, all of the assemblers are guilty of riot [unless they manifested a timely withdrawal]. On the other hand, if a riotous plan is suddenly conceived and executed by part of those who have *lawfully* assembled, only those who participate [in the execution of this plan], or [who] lend it encouragement, are guilty [of riot].

*Id.* at 484 (emphasis added).

It is also important to note that, at common law, riot did *not* occur when a number of people *independently* engaged in turbulent and violent conduct at the same time — and this remained true even if each of these people was reckless as to whether others might be simultaneously engaging in turbulent and violent conduct.

"The true gravamen of the [common-law] offense was planned and deliberate violent or tumultuous behavior involving a confederation of three or more

persons[.]"[4] "It is the acting in concert, the unlawful combination, which constitutes the offense."[5]   Thus, a charge of riot required proof of "a tumultuous disturbance of the peace by a group of three or more persons ... who act[ed] in concert to accomplish their purpose through force or violence."[6]

See, for example, the jury instructions that were cited approvingly by the federal circuit court for the District of Columbia in *United States v. Peaco*, 27 Fed. Cases 477, 4 Cranch D.C. Circuit Cases 601[7] (1835).  The trial judge in *Peaco* instructed the jurors that, before they could lawfully convict the defendants of riot, they had to be satisfied that the evidence established

> that the defendants, to the number of three or more, assembled; and, either at the time of [their] assembling or afterwards, while [they were still] assembled, formed an intent, [by using] force and violence, to do the acts charged in the indictment, ... and mutually to assist each other against any who should oppose them in doing such acts; and that the defendants did the same in a violent and turbulent manner, to the terror of the people [*i.e.*, the public].
>
> . . .

---

[4]   *Schlamp v. State*, 891 A.2d 327, 332 (Md. 2006).

[5]   *Cohen v. State*, 195 A. 532, 534 (Md. 1937) (quoting *Commonwealth v. Berry*, 71 Mass. 93, 94; 1855 WL 5953 at *2 (Mass. 1855)).

[6]   *A. & B. Auto Stores of Jones Street, Inc. v. City of Newark*, 279 A.2d 693, 699–700 (N.J. 1971).

[7]   This citation refers to the *Reports of Cases Civil and Criminal in the United States Circuit Court of the District of Columbia, from 1801 to 1841* authored by Chief Judge William Cranch — the same William Cranch who served as the unsalaried reporter of decisions for the United States Supreme Court from 1802 to 1815.  *See Wikipedia*, "William Cranch", https://en.wikipedia.org/wiki/William_Cranch (the section titled "Federal Judicial Service:  Reporter and Professor").

> [I]t is not material how ... [this mutual] intent was formed, nor ... is it necessary ... that [the defendants] should have actually made formal promises to each other, of mutual assistance, [so long as] they had such a mutual intent.

*Peaco*, 27 Fed. Cases at 478, 4 Cranch D.C. Circuit Cases at 602.

See also *Salem Manufacturing Co. v. First American Fire Insurance Co. of New York*, 111 F.2d 797, 804 (9th Cir. 1940) ("There is no doubt that under the common law [the phrase] 'force or violence' [in the context of riot] meant a concerted intent of the perpetrators to mutually assist one another against all who should oppose them in the doing of an unlawful act.").

This requirement of a mutual agreement to engage in tumultuous violence (and to assist each other in doing so) explains the result in cases such as *Aron v. City of Wausau*, 74 N.W. 354 (Wis. 1898). *Aron* was a case involving some thirty people who simultaneously (and unlawfully) disrupted the public peace by setting off fireworks on the Fourth of July. The Wisconsin Supreme Court held that even though all these people disturbed the public peace simultaneously, their actions did not constitute a riot — because they did not act pursuant to a preceding mutual agreement. The court explained, "[The requisite] three or more persons must have a common purpose to do the act complained of, and [only] if they commit [that] act with such [a] common purpose or intent, ... are [they] to be deemed guilty of a riot." *Id.* at 355.

See also *Commonwealth v. Merrick*, 1917 WL 3129 at *3 (Pa. App. 1917) (declaring that the government was required to prove that the rioters "engage[d] in violent proceedings with [the] promise of mutual assistance").

This requirement of concerted action — indeed, the offense of riot itself, and the perceived gravity of this offense — were all premised on the notion that when a group of people agreed to act together and to mutually assist each other in acts of

– 19 –

2802

turbulent violence, this group poses a greater threat to society than an equivalent number of individuals who happen to be simultaneously acting in a turbulent and violent manner — because "participants acting in concert [possess an] increased capacity to overcome resistance". 77 Corpus Juris Secundum, "Riot", § 2.

As the Illinois Appellate Court explained in *People v. Barnes*, "[The offense] of riot ... [was] designed to address the heightened threats posed to public safety and law enforcement when numerous persons confederate against the public peace ... , when a group of people acts together toward a common, violent or illegal, end."[8] Or as the appellate division of the Pennsylvania Superior Court stated in *Commonwealth v. Crawford*: "The essential element of a riot is group action."[9]

To summarize, then: The common-law offense of riot consisted of a series of actions committed by a group of people who shared several specified intents:

(1) first, the group must have engaged in an "unlawful assembly" — a gathering of three or more persons who mutually agree

- to pursue a shared goal
- by engaging in conduct which, if carried out, would constitute a riot — *i.e.*, a turbulent and violent attack on the persons or property of others, in a manner likely to cause reasonable people to apprehend a breach of the public peace,
- and to mutually assist each other in committing these acts (including resisting anyone who opposed them),

and then

---

[8]  *People v. Barnes*, 89 N.E.3d 969, 978–79 (Ill. App. 2017) (quoting Model Penal Code § 250.1 and its accompanying Comment at pp. 317\–18).

[9]  *Commonwealth v. Crawford*, 483 A.2d 916, 918 (Pa. App. 1984).

(2) the group, acting in concert, must have embarked upon the actual execution of this agreed-upon turbulent, violent, and unauthorized conduct.

*See Perkins and Boyce*, p. 483 & nn. 31–33; *Dixon v. State*, 31 S.E. 750, 753 (Ga. 1898).

This last requirement — that the unlawfully assembled group acted in concert when they engaged in their planned acts of turbulent violence — did not mean that every member of the group had to personally commit acts of violence. However, every member of the group had to at least be physically present and standing ready to assist the acts of violence, or to prevent resistance to these acts of violence. [10]

This legal principle was explained by the Georgia Supreme Court in 1860:

> [I]t is not necessary that [the rioters] should do [precisely] the same act, in the sense that what each one does must be identical with what is done by each of the others. If so, a riot [would be] an impossibility; for ... the action of each [rioter] [must inevitably] have a certain individuality which will distinguish it from the action[s] of all the rest. In [unlawfully] tearing down a house, for instance, one rioter breaks down a door, and another breaks down a window, and a third merely hands a crow-bar to one of his associates. Here each one's act is different from the acts of the others, and the act of [the third rioter] has in it nothing of violence. But there is an obvious legal sense in which they all do the same act. The

---

[10] See *Commonwealth v. Merrick*, 1917 WL 3129 at *3 & *5 (Pa. App. 1917), where the court declared that the government was required to prove that the rioters "engage[d] in violent proceedings with [the] promise of mutual assistance", and that anyone "who [was] present in the commission of any riotous act and [who] actively engaged therein, by act, sign, or words," could be convicted of riot. *See also Craig v. State*, 114 S.W.2d 1073, 1075–76 (Ark. 1938) (upholding the riot conviction of a defendant charged with "assembl[ing] together [with the required number of others] with the unlawful and wilful intent mutually to assist each other to [commit] assault and battery" where the evidence showed that the defendant repeatedly beat the victim while his companions stood nearby and physically prevented other people from rescuing the victim).

common intent which covers all the individual parts in the action cements those parts into one whole, of which each actor is a responsible proprietor. ... The principle [here] is that each one adopts the performances of all the rest and adds them to his own, and thus does the whole, in the sense of the definition [of riot], so long as they are acting in execution of a common intent, but no longer.

*Prince v. State*, 30 Ga. 27, 29; 1860 WL 2075 at *2 (Ga. 1860).

Or, to paraphrase this concept using the terminology of the common law: When the government charged one or more defendants with the common-law offense of riot, the government was required to prove that each alleged rioter was a principal — in either the first or the second degree — in the group's acts of turbulent violence.

(In general, principals in the first degree were the people who directly committed the offense, while principals in the second degree were people who were acting in concert with the principal(s) in the first degree and who were present at the scene of the crime to aid the commission of the offense.[11])

Bystanders who did not themselves agree to engage in or assist the riotous conduct could not be counted toward the minimum number of rioters, even if these bystanders observed and encouraged the acts of violence. This principle is illustrated by the decision of the Iowa Territorial Supreme Court in *Scott v. United States*, Morris 142, 145,[12] 1843 WL 3960 at *3–4 (Iowa 1843). In *Scott*, the court explained that if some lesser act of violence was occurring — for example, an assault and battery jointly

---

[11] For a full explanation of the common-law concepts of "principal in the first degree" and "principal in the second degree", see *Perkins & Boyce*, pp. 736–744. See also our summary of this topic in *Andrew v. State*, 237 P.3d 1027, 1033 (Alaska App. 2010).

[12] This citation refers to *Morris' Territorial Cases, 1839–1846* — the reports compiled by attorney Eastin Morris of the cases decided by the Iowa Supreme Court in the eight years immediately preceding Iowa's statehood in December 1846.

committed by fewer people than required by the riot statute — and if bystanders encouraged this assault but had not agreed to personally engage in the assault or physically assist it, the bystanders' encouragement did not turn the assault into a riot.

However, once the necessary minimum number of rioters commenced their group acts of turbulent violence (so that a riot had actually started), anyone who had solicited the riot, or any bystander who encouraged the rioters in their tumultuous and violent conduct, could be charged with riot as an accomplice. *Perkins and Boyce*, pp. 484–85 (explaining the accomplice liability of people who incite a riot or who "lend it encouragement"); 77 Corpus Juris Secundum, "Riot", § 17 ("If persons are [intentionally] present [at the scene of a riot] in order to lend the courage of their presence to the rioters, ... [such persons] may be equally guilty with the principals.").

We now turn to our next topic:  the elements of riot as that crime is now defined in Alaska's riot statute, AS 11.61.100(a).

*The elements of the crime of riot as codified in AS 11.61.100(a)*

Alaska's riot statute, AS 11.61.100(a), declares that a person commits the offense of riot "if, while participating with five or more others, the person engages in tumultuous and violent conduct in a public place and thereby causes, or creates a substantial risk of causing, damage to property or physical injury to a person."

Some of the words and phrases used in this statutory formulation are defined elsewhere in Alaska's criminal code.  For example, the phrase "public place" is defined in AS 11.81.900(b)(54) — and this definition expressly includes prisons. (We therefore reject Defendant Howard's argument that prisons are not "public places"

for purposes of the riot statute.) Likewise, the terms "person", "property", and "physical injury" are each defined in other subsections of AS 11.81.900(b). [13]

But Alaska's riot statute uses three key terms that are left undefined by our criminal code. According to the statute, the State must prove that a defendant "participated with" five or more other persons, and that, during this "participation", the defendant engaged in conduct that was both "tumultuous" and "violent".

Although the riot statute took effect more than forty years ago (in January 1980, along with the rest of Alaska's current criminal code), [14] the present appeal is the first time that an Alaska appellate court has been called upon to interpret these elements of the riot statute. [15] Thus, we have no Alaska precedent to guide or assist us in interpreting the meaning of these three key terms.

With no Alaska precedent to rely on, we turn to the legislative history of the riot statute. We have already examined the common-law definition of riot — because our riot statute is a codified version of this common-law crime, and also because Alaska

---

[13] *See* AS 11.81.900(b)(47) ("person"), AS 11.81.900(b)(53) ("property"), and AS 11.-81.900(b)(48) ("physical injury").

[14] *See* SLA 1978, ch. 166, §§ 7, 25.

[15] This Court has previously issued two decisions involving defendants who pleaded guilty to riot, but those appeals involved only sentencing issues. *See Davison v. State*, unpublished, 2020 WL 9174689 (Alaska App. 2020), and *A.C. v. State*, unpublished, 2018 WL 388602 (Alaska App. 2018).

In addition, in *Dawson v. State*, 264 P.3d 851, 856 & n. 12 (Alaska App. 2011), this Court briefly described Alaska's riot statute and some aspects of how it differed from the common-law crime of riot. However, our decision in *Dawson* did not involve a prosecution for riot; rather, the defendant in *Dawson* was charged with disorderly conduct, and we briefly discussed the definition of riot because it was relevant to properly interpreting the meaning of the portion of Alaska's disorderly conduct statute, AS 11.61.110(a)(5), which makes it illegal to challenge another person to fight or to engage in fighting other than in self-defense.

law presumes that our statute retains the elements of intent that were required at common law. We will also examine the definitions of riot found in the Oregon Criminal Code and in the American Law Institute's Model Penal Code, because both of these sources contain formulations of "riot" that are precursors of our statute.[16] And we will examine the commentary to AS 11.61.100 that was written by the Alaska Criminal Code Revision Subcommission (the drafters of our statute).

### (1) The meaning of the phrase "participating with" as used in the riot statute

The first issue we must address is the meaning of the statutory phrase, "participating with five or more others". Our riot statute specifies that the government must prove that the defendant engaged in a particular kind of conduct — "tumultuous and violent conduct" — while the defendant was "participating with" five or more other people. But the riot statute does not expressly identify what kind of group activity the defendant must be "participating" in when the defendant engages in the tumultuous and violent conduct. The statute says only that this group activity must include at least six participants (*i.e.*, the defendant and at least five others).

The statute's phrasing is potentially broad enough to encompass situations where a person is "participating with" five or more others in conduct that is completely lawful, but then the person individually decides to engage in conduct that is tumultuous and violent (for example, if one player on a baseball team were to jump into the bleachers and launch a physical attack on a heckling fan).

---

[16] *See* Alaska Criminal Code Revision, Tentative Draft, Part 5 (1978), p. 127 (citing Oregon's riot statute, § 166.015, as a primary source of Alaska's riot statute).

But interpreting the statute in this way would be a substantial departure from any traditional understanding of riot. "Riot" was not a disturbance of the peace by a single person who happened to be participating in some sort of group activity at the time. Rather, as we explained in our discussion of the common-law offense of riot, the crime of riot has always been understood to mean a *group* disturbance of the peace by people who have *mutually agreed to do so* (and have mutually agreed to assist each other).

This brings us to the interpretation of "participating with" that the trial court adopted in the present case — the interpretation contained in the jury instructions.

*(a) The trial court's interpretation of "participating with", and why this interpretation is incorrect*

The trial court rejected the notion that the phrase "participating with five or more others" referred to a mutual agreement among the defendant and five or more other people. Instead, the trial court ruled that the phrase "participating with" referred to a surrounding "circumstance" of each individual defendant's own conduct — the circumstance that, when that defendant engaged in their own individual tumultuous and violent conduct, at least five other people were likewise engaged in tumultuous and violent conduct of their own.

And because, under our criminal code's rules of statutory construction, recklessness is the culpable mental state that normally applies to circumstances,[17] the trial court concluded that the State was only required to prove that each defendant acted "recklessly" with respect to the possibility that at least five other people were likewise engaging in tumultuous and violent conduct.

---

[17] *See* AS 11.81.610(b)(2).

In other words, the trial court ruled that the State was only required to prove that each defendant was aware of, and consciously disregarded, a substantial and unjustifiable *risk* or *possibility* that at least five other people were engaged in their own individual tumultuous and violent conduct at that same time. [18]

In effect, the trial court interpreted the phrase "participating with ... others" in its broadest sense — much as we might say that a person is "participating" with hundreds or thousands of other people in a charitable fund-raising drive when the person makes a donation to a charity in response to the charity's fund-raising plea.

In most instances, the people who give money in response to such fund-raising pleas do not make their decisions in concert with other donors. There is no group agreement among the donors, and often the individual donors do not know for certain whether anyone else has decided to give money to the charity. But given the nature of charitable fund-raising pleas, individual donors will be aware of a substantial *likelihood* that they will not be the only donor — that a number of other people will also choose to respond to the fund-raising plea.

Even though the word "participate" is sometimes used in this manner, interpreting our riot statute this way would eliminate the intent elements required for the common-law offense of riot — in particular, the requirement that a group of people *mutually agree* (either explicitly or tacitly) to concurrently engage in, and to assist each other in, tumultuous and violent conduct to achieve or to advance a shared purpose.

This brings us back to the Alaska rule of statutory construction that we discussed earlier: When a felony statute codifies a common-law crime, the statute should presumptively be interpreted to require proof of the same elements of intent that were required at common law, even when the wording of the statute does not explicitly require

---

[18] This is the definition of acting "recklessly" codified in AS 11.81.900(a)(3).

proof of these elements. This presumption is defeated only if the wording or the legislative history of the statute affirmatively demonstrates that the Alaska legislature intended to eliminate these common-law elements. [19]

Alaska's riot statute requires proof that the defendant "participated with" five or more others, but the statute is silent as to whether this phrase encompasses the common-law elements of a mutual agreement among the rioters (1) to achieve or advance a shared purpose (2) by engaging in tumultuous and violent conduct, and (3) by assisting each other in committing this tumultuous and violent conduct (including resisting anyone who might oppose it). So unless the legislative history of the riot statute affirmatively demonstrates that our legislature intended to depart from the common law by eliminating these elements, we must construe the phrase "participating with" as requiring proof of these common-law elements.

With this presumption in mind, we now resume our examination of the legislative history of our riot statute by examining its predecessors — the riot provision of the Model Penal Code and Oregon's riot statute — and by examining the Alaska drafters' commentary to our statute, AS 11.61.100.

*(b) The Model Penal Code's riot provision*

Oregon's riot statute, Oregon Revised Statutes § 166.015, is the immediate source of our statutory language, "participating with five or more others". [20] The Oregon drafters took this phrase from the riot provision of the Model Penal Code, § 250.1.

---

[19] *Tarnef v. State*, 512 P.2d 923, 929 (Alaska 1973); *Speidel v. State*, 460 P.2d 77, 79 (Alaska 1969); *Lee v. Anchorage*, 70 P.3d 1110, 1113 (Alaska App. 2003).

[20] *See* Alaska Criminal Code Revision, Tentative Draft, Part 5 (1978), p. 127.

Under the Model Penal Code, riot is an aggravated form of disorderly conduct.[21] The Model Penal Code's riot provision, § 250.1 (when read in conjunction with the pertinent portions of the Model Penal Code's definition of disorderly conduct), states that a person commits riot if:

- "with purpose to cause public inconvenience, annoyance or alarm",
- "[the person] participates with [two] or more others" in a course of conduct
- involving "fighting", "threatening", or "violent or tumultuous behavior"
- with the intent "to commit or facilitate the commission of a felony or misdemeanor", or "to prevent or coerce official action", or "when the [person] or any other participant to the [person's] knowledge ... uses or plans to use a firearm or other deadly weapon."

It appears that Model Penal Code § 250.1 was the first definition of riot to employ the phrase "participat[ing] with" as a reference to the required mutual agreement and joint efforts of the rioters. Although this "participating with" formulation does not explicitly echo the common-law requirements that the rioters acted jointly by mutual agreement, the Comment that accompanies Model Penal Code § 250.1 repeatedly

---

[21]  Here is the Model Penal Code's riot provision, § 250.1(1):

*Riot*.  A person is guilty of riot ... if he participates with [two] or more others in a course of disorderly conduct:
(a) with purpose to commit or facilitate the commission of a felony or misdemeanor;
(b) with purpose to prevent or coerce official action; or
(c) when the actor or any other participant to the knowledge of the actor uses or plans to use a firearm or other deadly weapon.

In this definition of riot, the phrase "a course of disorderly conduct" refers to the definition of disorderly conduct found in Model Penal Code § 250.2. Under subsection (1)(a) of this definition, a person commits disorderly conduct if, "with purpose to cause public inconvenience, annoyance or alarm", the person "engages in fighting or threatening, or in violent or tumultuous behavior".

explains that the Model Penal Code's riot provision was meant to incorporate the common-law requirements of a mutual agreement and joint action by the rioters.

On page 318 of the Model Penal Code Comment to § 250.1, the drafters describe the offense of riot as occurring "when numerous persons *confederate* against the public peace" (emphasis added). And on page 321 of that same Comment, the drafters clarify that "it [does not] suffice that three or more individuals were engaged in similar but unrelated activities." Thus, in footnote 38 of the Comment to § 250.1, the drafters approvingly cite the case of *Aron v. City of Wausau*, 74 N.W. 354, 355 (Wis. 1898) — the case where the Wisconsin Supreme Court held that no riot occurred when some thirty people simultaneously disrupted the public peace by setting off fireworks on the Fourth of July, because there was no proof that these people acted pursuant to a mutual agreement.

In this same footnote, the Model Penal Code drafters also approvingly cite the decision in *State v. Abbadini*, 192 A. 550 (Del. General Sessions 1937):

> A riot [is] defined as a tumultuous disturbance of the peace by three or more persons, assembled *and acting with a common intent* [to execute either] a lawful ... [or an] unlawful enterprise in a violent and turbulent manner. To render persons guilty[,] *they must act in concert and there must be a common intent or purpose to do the act complained of.* It is not necessary, however, that the parties shall have deliberated or [explicitly] exchanged views with each other before entering upon the execution of their common purpose[.] [Rather,] concert of action ... and a common intent or purpose may be inferred from the manner in which the act is done.

*Abbadini*, 192 A. at 551–52 (emphasis added).

The Model Penal Code Comment also cites *Loomis v. State*, 51 S.E.2d 33, 44 (Ga. App. 1948) ("[It] is well settled that in riot cases there must be present [a] common intent and [a] concert of action in the furtherance of [that] intent."); and *Proctor v. State*, 115 P. 630, 632 (Okla. Crim. App. 1911) (reversing the defendants' riot convictions because "there [was] a total absence of testimony that the defendants ... ever assembled or confederated to violate the law, or that they acted in concert, or acted together").[22]

In short, even though the drafters of the Model Penal Code riot provision used the new (and unfortunately nebulous) phrase "participates with" to describe the shared mental state and joint efforts of the rioters, the drafters' Comment to § 250.1 shows that they intended to retain the common-law requirement that, to constitute a riot, there had to be a *mutual agreement* among the requisite number of people to achieve a shared objective by jointly engaging in turbulent and violent conduct.

As the drafters' approving citation of *Aron v. City of Wausau* shows, the drafters did not intend for a defendant to be convicted of riot merely because the government proved that the defendant acted recklessly as to whether other people might likewise be contemporaneously engaged in turbulent and violent conduct. Rather, like the common-law offense of riot, the Model Penal Code riot provision requires proof of mutual agreement and concert of action.

---

[22] Note, however, that on page 322 of the Model Penal Code Comment, the drafters also clarify that even people who oppose each other — for instance, members of rival political parties or rival gangs — can act together and commit the offense of riot if they jointly agree to engage in tumultuous and violent conduct against each other: "Section 250.1 [of the Model Penal Code] reaches all persons who actually participate in a [common] course of disorderly conduct ... even if the participants are opponents rather than allies."

*(c) The Oregon riot statute*

The drafters of Oregon's riot statute, ORS § 166.015, adopted the Model Penal Code's use of the phrase "participating with" to describe the confederation of the rioters — requiring the government to prove that the defendant, "while participating with five or more other persons[,] ... engage[d] in tumultuous and violent conduct". This Oregon statute is the direct source of the "participating with" phrasing that is found in Alaska's riot statute. *See* Alaska Criminal Code Revision, Tentative Draft, Part 5, p. 127.

But even though the drafters of Oregon's riot statute employed the phrase "participating with" to refer to the joint endeavor of the rioters, the Oregon drafters never suggested that they intended to abandon the common-law requirements of a shared purpose, a mutual agreement to accomplish that purpose by turbulence and violence, and an ensuing concert of action. These elements of mutual agreement and concerted action are discussed in several portions of the drafters' commentary to ORS § 166.015.[23]

In fact, the Oregon commentary begins by summarizing the elements of the offense of riot at common law, including the requirements that at least three people assemble with the intent to execute a shared purpose, and with the further intent to aid each other in accomplishing this shared purpose by force if necessary.[24]

---

[23] This commentary is found in the Oregon Criminal Law Revision Commission's Tentative Draft No. 1 (February 1970), Article 26: "Riot, Disorderly Conduct and Related Offenses", pp. 4–5. It is also found in the Proposed Oregon Criminal Code, Final Draft and Report (1970), p. 212, Commentary to § 218 (the offense of riot).

The final draft of Oregon's revised Criminal Code and its accompanying commentary is available at: https://digitalcollections.library.oregon.gov/nodes/view/256147.

[24] Oregon Tentative Draft No. 1, Article 26, p. 4 (quoting *Kenny's Outlines of Criminal Law* (17th edition, 1958), section 437), and Proposed Oregon Criminal Code, Final Draft and Report, p. 212.

The Oregon commentary also cites the Oregon Supreme Court's decision in *State v. Mizis*, 85 P. 611 (Or. 1906), as a "comprehensive analysis" of Oregon's pre-existing law of riot. In *Mizis*, the Oregon court stated that, to establish the crime of riot, the government was required to prove that at least three people used force or violence (or threatened the immediate use of force or violence), and that these people were "acting together" in the sense that "they [had] a common purpose to do the act complained of or [were] engaged in aiding and assisting one another to accomplish [that] common purpose". *Id.*, 85 P. at 615.

These portions of the Oregon riot commentary are significant because they show that the Oregon drafters were aware that the common-law offense of riot required proof of the group's mutual agreement and shared intents. Even though the Oregon drafters opted to use the Model Penal Code's phrase "participating with", and to omit any explicit reference to the agreement and shared culpable mental states required at common law, the drafters were aware of these common-law elements, and there is no indication that the drafters intended to abandon these elements. Rather, the Oregon drafters' commentary declares that their proposed riot statute departs from the common law in only two particulars:

> The proposed [statute] adopts the modern concept of a "riot" by requiring a greater number of rioters [than the three required at common law] and by shifting the emphasis [away] from the [rioters'] commission of some other crime to the [riotous] "conduct" [itself] that creates a risk of causing "public alarm." [25]

---

[25] Oregon Tentative Draft No. 1, Article 26, p. 4, and Proposed Oregon Criminal Code, Final Draft and Report, p. 212.

Indeed, in the very next paragraph of the Oregon commentary, the drafters declare that Oregon's riot statute continues to require proof that the requisite number of rioters were engaged "in a common disorder" — and not simply that "numerous individuals were engaged in similar unrelated activities."[26]

### (d)  The Alaska drafters' commentary to our riot statute

To sum up this discussion so far:  The "participating with" wording of Alaska's riot statute comes from Oregon's riot statute, ORS § 166.015, and the drafters of Oregon's statute took this wording from the Model Penal Code riot provision, MPC § 250.1.  But even though these two sources use the phrase "participating with" instead of referring explicitly to the joint agreement and the shared purposes required at common law, both the Oregon riot statute and the Model Penal Code riot provision carry forward these common-law requirements.  There must be a mutual agreement among the rioters (1) to achieve or advance a shared purpose (2) by engaging in tumultuous and violent conduct, and (3) to assist each other in committing this tumultuous and violent conduct (including resisting anyone who might oppose it).

The Alaska commentary to our riot statute gives no indication that the drafters intended to abandon these elements of common-law riot.  Rather, the drafters' commentary speaks of their intention to alter a different aspect of Alaska's pre-existing riot law.

Before the adoption of our current criminal code, the punishment for riot in Alaska hinged on what *other* crimes the rioters committed during the riot, or what

---

[26]  Oregon Tentative Draft No. 1, Article 26, p. 5, and Proposed Oregon Criminal Code, Final Draft and Report, p. 212.

other actions they took during the riot.[27] But in their commentary to the Tentative Draft of the new criminal code, the Alaska drafters declared that the new riot statute "shift[ed] the emphasis of the crime [away] from the commission of other crimes by [the] rioters". Instead, the new riot statute placed its emphasis on the underlying nature of the rioters' conduct ("tumultuous and violent conduct in a public place") and on the results of the rioters' conduct — *i.e.*, the fact that the rioters "recklessly cause[d], or create[d] a substantial risk of causing[,] damage to property or physical injury to a person."[28]

### (e) Our conclusion regarding the meaning of "participating with" as used in the riot statute

We now return to the Alaska rule of statutory construction that we described earlier: When a felony statute codifies a common-law crime, and when that common-law crime required the government to prove that a defendant acted with one or more particular intents, Alaska courts should interpret our modern-day statute as incorporating this same requirement, even though the wording of the statute might not appear to require proof of these intents, unless the wording of the statute or the statute's legislative history affirmatively demonstrates that the Alaska legislature intended to depart from the common law and abandon these elements.[29]

---

[27] *See* former AS 11.45.010, which punished anyone who engaged in a riot: (1) as a principal in any crime committed during the riot; or (2) by fifteen years' imprisonment if the person was disguised, carried a "species of dangerous weapon", or solicited acts of force; or (3) by a sentence of three months' to one year's imprisonment in "all other cases".

[28] Alaska Criminal Code Revision, Tentative Draft, Part 5 (1978), p. 82.

[29] For the relevant case law, see footnote 2.

As we have explained, even though the Alaska legislature adopted the "participating with" language of the Oregon riot statute and the Model Penal Code (rather than adopting language that would explicitly refer to the common-law requirements of mutual agreement and concert of action among the rioters), there is nothing in the legislative history of our riot statute to suggest that the Alaska drafters intended to abandon these common-law elements. Rather, the commentary to our riot statute, as well as the commentaries to its predecessors (the Oregon riot statute and the Model Penal Code riot provision), all indicate the opposite.

We therefore construe the phrase "participating with" as implicitly incorporating the common-law elements of a mutual agreement and shared intent on the part of the rioters — more specifically, a mutual agreement by the defendant and at least five other people (1) to achieve or advance a shared purpose (2) by engaging in tumultuous and violent conduct, and (3) by assisting each other in committing this tumultuous and violent conduct, including resisting anyone who might oppose it.

Even though our riot statute requires proof of an antecedent mutual agreement and ensuing joint action by a group of the requisite size, the statute does not require proof that every member of this group personally committed acts of violence. As was true at common law, it is sufficient that at least one member of the group actually committed violence (or threatened immediate violence) upon persons or property, so long as the State proves that the other members of the group were, by prior agreement, physically present and standing ready for the purpose of assisting the agreed-upon acts of violence or preventing resistance to the agreed-upon violence.

Accordingly, the trial court committed error when the court instructed the jury that there was no requirement of mutual agreement — that the defendants in this case could be found to have "participated with" five or more others if the defendants

were merely reckless as to whether at least five other inmates were likewise engaged in tumultuous and violent conduct at the time.

### (2) The meaning of the term "tumultuous" as used in the riot statute

Under the definition of riot codified in AS 11.61.100(a), the government must prove that a defendant engaged in conduct that was both tumultuous and violent. In addition, as we just explained in the preceding section of this opinion, the government must prove that the defendant and at least five other people, acting in furtherance of a shared objective, mutually agreed to engage in, and to assist each other in, this tumultuous and violent conduct. All of this raises the question of what the drafters of our riot statute meant by "tumultuous" conduct and "violent" conduct.

We will address the meaning of "tumultuous" conduct in this section of our opinion, and then we will address the meaning of "violent" conduct in the next section.

### (a) The trial court's interpretation of "tumultuous"

At the trial in the present case, when the trial court and the parties discussed how the jury should be instructed on the elements of riot, their discussion of the term "tumultuous" did not include any references to what this term may have meant at common law, or how this term had been discussed in the legislative history of our riot statute (either in the commentary written by the Alaska Criminal Code Revision Subcommission or in the commentary written by the drafters of Oregon's riot statute). Nor did their discussion contain any mention of how this term had been interpreted by the courts of other states in the context of prosecutions for riot.

Rather, the discussion of this topic consisted primarily of the prosecutor and the defense attorneys presenting their personal views of what the word "tumultuous" meant — supplemented by a discussion of some of the available dictionary definitions of "tumultuous".

Relying on standard dictionary definitions, the trial court ultimately ruled that "tumultuous" meant "loud, excited, and chaotic". This is the definition that the jurors received.

### (b) Legislative history pertaining to the meaning of "tumultuous"

As we noted earlier in this opinion, there is no definition of "tumultuous" in Alaska's criminal code. However, the commentary to our riot statute in the Tentative Draft of our criminal code contains a discussion of this term.

In their commentary, the drafters of our statute noted that the common-law offense of riot "required a tumultuous disturbance of the peace".[30] Here, the drafters are referring to the common-law concept that has been described by legal commentators as "[conduct of] such a violent, turbulent[,] and unauthorized [nature] as to create [a] likelihood of public terror and alarm". See our earlier quotation from Perkins and Boyce, *Criminal Law*, p. 483 & n. 31.

The Alaska drafters criticized Alaska's previous riot statute (former AS 11.45.020) for ill-advisedly abandoning this common-law requirement of "tumultuous" conduct.[31] Because the former riot statute omitted any mention of "tumultuous" (or "turbulent") conduct, the statute apparently only required the

---

[30] Alaska Criminal Code Revision, Tentative Draft, Part 5, p. 82.

[31] *Ibid.*

government to prove that a group of three or more persons, acting by mutual agreement, unlawfully engaged in violence (or threatened to immediately engage in violence) against persons or property. Thus, according to the drafters, Alaska's former riot statute was so broad that it extended to instances where "three persons ... are committing a robbery."[32]

The drafters of our riot statute concluded that the definition of riot would be improperly broad unless it returned to the common-law requirement of conduct that was both violent *and* tumultuous, so they inserted an explicit reference to "tumultuous" conduct in the definition of the offense.

With this history in mind, we return to the present case, and the trial court's instruction to the jury that "tumultuous" conduct meant "loud, excited, and chaotic" conduct. This definition was, at best, an inexact and misleading approximation of the common-law element of "tumultuous" or "turbulent" conduct.

The heart of the common-law element of "tumultuous" or "turbulent" conduct was proof that the defendants' conduct breached the public peace in a manner that created a "likelihood of public terror and alarm". Judges and lawyers referred to this element of public terror or alarm by using the Latin phrase *in terrorem populi* ("to the terror of the people"), and this allegation was a necessary element of all common-law indictments for riot.[33]

The drafters of Oregon's riot statute (the immediate source of our statute) incorporated this same requirement into their statute (although, instead of referring to

---

[32] *Ibid.*

[33] *See Perkins and Boyce*, p. 483 n. 32 (citing *Rex v. Cox*, 4 Car. & P. 538, 172 England Reports 815 (1831)). ("Car. & P." refers to Carrington and Payne's *Reports of Cases at Nisi Prius*.)

violent and tumultuous conduct that creates a "likelihood" of public terror and alarm, the Oregon statute refers to conduct that "creates a grave risk of causing public alarm"). [34]

The commentary to the Oregon riot statute declares that the phrase "tumultuous and violent conduct" was intended "to represent *more than* mere loud noise or disturbance" (emphasis added) — that, instead, this phrase was intended to refer to "terroristic mob behavior involving ominous threats of personal injury and property damage." [35] A little later in the Oregon commentary, the drafters reiterated that "[t]he thrust of the proposed riot [statute] is directed toward unlawful group action producing or creating a grave risk of [producing] public 'alarm.' "

Thus, when the Alaska drafters decided to explicitly require proof of "tumultuous" conduct as an element of the crime of riot, their intent was to restore the "public terror and alarm" element of common-law riot — so that the definition of riot would no longer be so broad as to encompass all instances of group violence (such as multi-participant robberies) committed by the statutory minimum number of people.

Under Alaska law, a charge of riot requires proof of conduct that is both violent *and* "tumultuous" — not in the popular sense of "loud, excited, and chaotic", but rather in the common-law sense of creating a likelihood of public terror and alarm

---

[34] Oregon Statute § 166.015.

[35] Proposed Oregon Criminal Code, Final Draft and Report (1970), p. 212, Commentary to § 218 (the offense of riot).

Oregon's riot statute was based primarily on New York's riot statute, New York Penal Law § 240.05. *See* Oregon Commentary to § 218 (the offense of riot), p. 212 ("B. Derivation"). The portion of the Oregon commentary that we cite here was taken, almost *verbatim*, from the commentary to New York's riot statute. *See* Donnino, *Practice Commentaries*, McKinney's Consolidated Laws of New York, Book 39, p. 210 (discussing New York Penal Law § 240.05).

— what the drafters of the Oregon riot statute referred to as "terroristic mob behavior involving ominous threats of personal injury and property damage."

For these reasons, we conclude that the jurors in the present case were misinstructed on the meaning of "tumultuous" conduct.

We must also point out that, as the wording of our riot statute indicates, the requirement of public terror and alarm is not automatically satisfied by the fact that the defendants' conduct occurs in a "public place" as defined in AS 11.81.900(b)(54). Our riot statute requires the government to prove *both* that a group of people engaged in tumultuous and violent conduct *and* that this group conduct occurred in a public place.

### *(3) The meaning of the term "violent" as used in the riot statute*

We now turn briefly to the question of what type of conduct qualifies as "violent" conduct for purposes of the riot statute.

As we have already discussed, the gist of the common-law offense of riot is a mutual agreement by three or more persons to jointly engage in an enterprise in a turbulent and violent manner likely to cause reasonable people to apprehend a breach of the public peace.[36] Alaska's riot statute, AS 11.61.100(a), similarly requires proof that the requisite minimum number of people (at least six) participated with each other in "tumultuous and violent conduct".

But Alaska law does not explicitly define what constitutes "violent" conduct (or "violence") for purposes of the riot statute. This term is not defined in the statute itself nor in any other provision of our criminal code.

---

[36] *Perkins and Boyce*, p. 483.

At common law, a charge of riot required proof that the rioters' actions were "accompanied with some offer of violence, either to the person of a man or to his possessions, as by beating him, or forcing him to quit the possession of his lands or goods", or by exhibiting "an apparent tendency thereto" (*i.e.*, by explicitly or implicitly threatening an immediate resort to this type of violence). William Hawkins, *A Treatise of the Pleas of the Crown* (1716), Book 1, ch. 65, sections 4–5, p. 157.

At various points in his discussion, Hawkins uses other phrases to describe the required level of violence: "actual force *or* violence", "force *and* violence", "violence or terror". *Id.* at 156–57 (emphasis added). But Hawkins apparently views these different formulations as equivalent. The underlying requirement is the rioters' use of violent force against persons or property, or the rioters' plausible threat to immediately do so.

(Regarding this latter aspect of the definition, see, for example, *Green v. State*, 35 S.E. 97, 101 (Ga. 1900), where the court held that the offense of riot was committed when "a number of persons assemble[d] to prevent an arresting officer from removing a prisoner [and taking him to jail], and [these persons did] actually prevent him, by intimidation arising from [their] possession of arms, [accompanied by] threats to shoot and kill, ... though no specific act of violence [was] committed.")

Alaska's riot statute continues to require the government to prove that the rioters mutually agreed to engage in, and then did engage in, "violent" conduct to achieve a shared goal. And there is nothing in the wording of our riot statute, or in its legislative history, to indicate that the drafters of the statute intended anything different from the common-law requirement of physical violence exerted against a person or property (or a threat to immediately engage in such violence).

– 42 – 2802

At the trial in this case, the trial court instructed the jurors that, for purposes of the riot statute, "violent" conduct meant any conduct "using or involving physical force intended to hurt, damage, or kill someone or something."

At first blush, this definition seemingly conforms to Hawkins's description of the common-law requirement, as well as to the modern-day commonly understood meaning of physical "violence". See, for instance, the definition of "violence" in the *Oxford English Dictionary*: "the deliberate exercise of physical force against a person, property, etc.; physically violent behaviour or treatment; ... the unlawful exercise of physical force, [or] intimidation [of others] by the exhibition of such force." [37]

But in ruling on the defendants' motions for judgements of acquittal at the close of the State's case-in-chief, the trial court adopted an expansive interpretation of the phrase "using or involving physical force" set out in the jury instruction. The court declared that this phrase encompassed not only the exertion of physical force against another person or against another person's property, but also any other "physical" act — basically, any bodily movement — that a person might engage in for the purpose of creating or increasing a hazard of injury to another person or to property. The court then relied on this expansive definition of "violent" conduct when the court declared that the inmates engaged in "violence" by taking various actions designed to impede the progress of law enforcement officers if and when the officers decided to forcibly re-assert control over the A Wing. Later, the prosecutor relied on this interpretation of "violent" conduct when he presented his closing arguments to the jury.

The trial court's interpretation of "violent" conduct appears to significantly exceed the common understanding of what constitutes an act of "violence". We note,

---

[37] *Oxford English Dictionary*, "violence": https://doi.org/10.1093/OED/4998467199. (Last updated December 2024.)

for instance, that the federal courts have reached a substantially more limited interpretation of what constitutes a "violent felony" for purposes of the Armed Career Criminal Act. [38]

In addition, during the litigation of this case, both the trial court and the prosecutor repeatedly suggested that the inmates who refused to leave the A Wing engaged in "violence" because (1) these inmates knew that the corrections officers and the other law enforcement officers who came to assist them would likely use force to

---

[38] See *Johnson v. United States*, 559 U.S. 133, 140–41; 130 S.Ct. 1265, 1271; 176 L.Ed.2d 1 (2010), where the Supreme Court held that the phrase "physical force against the person of another," for purposes of establishing a "violent felony" under the Armed Career Criminal Act, 18 U.S.C. § 924(e), was limited to exertions of force sufficient to injure another person or cause them physical pain. See also *Leocal v. Ashcroft*, 543 U.S. 1, 9–10; 125 S.Ct. 377, 382–83; 160 L.Ed.2d 271 (2004), where the Court held that the term "crime of violence" (defined in 18 U.S.C. § 16(a) as a crime involving the "use ... of physical force") was limited to crimes requiring proof of an "active employment" of physical force against another person, and that this term did not include crimes where the government is required to prove only that the defendant negligently caused harm to another person.

*See also United States v. Hernandez-Castellanos*, 287 F.3d 876, 879–81 (9th Cir. 2002) (holding that the crime of "recklessly endangering another person with substantial risk of imminent death or physical injury" is not a crime of violence under 18 U.S.C. § 16(b) because it does not require proof of "a risk that physical force will be used against another"); *United States v. Culbertson*, 389 F. App'x 515, 520 (6th Cir. 2010), and *United States v. Herrick*, 545 F.3d 53, 59 (1st Cir. 2008) (holding that vehicular manslaughter is not a crime of violence for purposes of the Armed Career Criminal Act or the Federal Sentencing Guidelines, respectively); *United States v. Smith*, 544 F.3d 781, 786 (7th Cir. 2008) (holding that crimes which require proof of only negligence or recklessness do not qualify as violent felonies under the Armed Career Criminal Act). *But see United States v. Begay*, 33 F.4th 1081, 1090–96 (9th Cir. 2022) (en banc) (holding that a defendant commits a "crime of violence" under 18 U.S.C. § 924(c) if the defendant commits a crime requiring proof that the defendant caused injury or death through the kind of extreme recklessness characterized as "extreme disregard for human life" — what Alaska's criminal code calls "extreme indifference to the value of human life"; *see, e.g.*, AS 11.41.110(a)(2)).

re-establish control over the A Wing, and (2) the inmates anticipated that *the efforts of these officers* would lead to injury to persons and/or damage to prison property.

But to sustain a charge of riot, the government must prove that the *defendants* engaged in violent conduct — not that other people responded to the defendants' conduct with violence.

The State, in its brief to this Court, argues that the trial court's expanded definition of riot was proper because, historically, charges of riot (or charges of disturbing the peace) have been leveled against people who did not engage in any violence themselves, but whose speech or other actions elicited violent responses from onlookers or from the police.

The State is correct that, until the middle of the twentieth century, courts often upheld the criminal convictions of non-violent political and social protesters whose speech, or whose very presence on the public streets, evoked a violent response from other people.[39] But since the middle of the twentieth century, both the United States Supreme Court and the Alaska Supreme Court have clarified that protesters who themselves do not engage in violence (or openly call for immediate acts of violence) cannot be prosecuted for other people's violent responses to their speech or to their presence in public places. *See Terminiello v. City of Chicago*, 337 U.S. 1, 4–5; 69 S.Ct. 894, 896; 93 L.Ed. 1131 (1949); *Sabel v. Stynchcombe*, 746 F.2d 728, 730–31 (11th Cir. 1984); and *Marks v. Anchorage*, 500 P.2d 644, 647–48 (Alaska 1972).

---

[39] See, for example, *People v. Burman*, 117 N.W. 589, 592 (Mich. 1908), affirming the convictions of demonstrators who paraded through the streets displaying a red flag (*i.e.*, a flag promoting anarchism), since the protesters knew that this flag "would excite fears and apprehension" in onlookers and that the display of this flag "would provoke violence and disorder".

We do not mean that non-rioting protesters are immune from prosecution if they engage in trespass or some other violation of the law. We note, for instance, that Alaska's disorderly conduct statute has a provision that prohibits people from creating a hazardous condition for others without legal justification or excuse; *see* AS 11.61.-110(a)(6). This provision might well apply to the actions of the inmates who poured water and shampoo into the corridor of the A Wing.[40]

---

[40] In a series of unpublished decisions, the appellate division of the New Jersey Superior Court has held that prison inmates who refused to return to their cells when ordered to do so, or who engaged in other unauthorized conduct after being warned to desist, could be disciplined for "encouraging a riot" even though they committed no act of violence.

*See Scirica v. New Jersey Dept. of Corrections*, unpublished, 2021 WL 4314250 (N.J. App. 2021); *Hersey v. New Jersey Dept. of Corrections*, unpublished, 2021 WL 6109823 (N.J. App. 2021); *Downey v. New Jersey Dept. of Corrections*, unpublished, 2022 WL 38855 (N.J. App. 2022); *Connolly v. New Jersey Dept. of Corrections*, unpublished, 2022 WL 386107 (N.J. App. 2022); and *Hutcheson v. New Jersey Dept. of Corrections*, unpublished, 2022 WL 944408 (N.J. App. 2022).

These New Jersey decisions do not contradict the decision we reach here concerning Alaska's riot statute — because the New Jersey courts were employing a specialized definition of "encouraging a riot". As quoted in *Hutcheson*, 2022 WL 944408 at *1, the offense of "encouraging a riot" (the offense at issue in this series of cases) is committed "whenever a group of inmates assaults any official, destroys state property, *bands together to resist authority*, *refuses to return to their housing assignments*, or *causes an overt act which interferes with the orderly running of the institution* or endangers the well[-]being of any staff member or inmate." (Emphasis added.)

Because this particular offense (which applies only to prisons) can be committed even though there is no act of violence, it differs significantly from the New Jersey offense of riot, which requires proof of "a tumultuous disturbance of the peace by a group of three or more persons having a common purpose who act in concert to accomplish their purpose through force or violence ... [and] the disturbance operate[s] to the terror of the people." *A. & B. Auto Stores of Jones Street, Inc. v. City of Newark*, 279 A.2d 693, 700 (N.J. 1971).

That all said, because we are reversing the defendants' riot convictions on other grounds, we need not resolve these issues regarding the meaning of "violent" conduct as that term is used in our riot statute. But if the State intends to retry the defendants, these are issues that must be addressed and resolved by the superior court.

*Our conclusion with respect to the defendants' convictions for riot*

For the reasons explained in this section of our opinion, we conclude that the jurors in this case were improperly instructed on what the riot statute means when the statute refers to a defendant's "participating with five or more others", and what the statute means when it refers to "tumultuous" conduct.

In reaching these conclusions, we acknowledge that the trial judge in this case was confronted with a difficult situation. There have been few prosecutions for riot under our current statute, and (as far as we know) no prosecution under that statute had gone to trial until this case. Because of this, there were no Alaska appellate decisions construing the riot statute and resolving the legal questions we have addressed here.

During the trial proceedings, the judge expressly noted that her analysis of the riot statute was hampered by the fact that the defendants' case "[was brought] to trial rather quickly, without much pretrial thought", and by the fact that the riot statute "is not a statute any of us [see] on a daily basis. [This crime is] rarely charged in this state."

At various times during the defendants' trial, the judge noted that it was unclear how some aspect of the riot statute should be interpreted. Indeed, at one point the judge implored the attorneys to share any research they had done regarding the offense of riot — especially, research into the elements of proof and the necessary jury instructions.

But when these questions arose, the prosecutor and the defense attorneys never offered the judge any relevant legal research regarding the meaning of the three crucial terms we have been discussing: "participating with", "tumultuous", and "violent". Instead of filing pleadings addressing these matters of statutory interpretation — research into the legislative history of the riot statute, or research into the common-law offense of riot, or research into the history and interpretation of statutes from other states with similar definitions of riot (in particular, Oregon) — the prosecutor and the defense attorneys simply offered their views as to how these elements of the statute should be interpreted, without citing any authority other than definitions found in standard dictionaries to support their positions.

In short, the judge was forced to sort out these matters while the trial was taking place, with little meaningful assistance from the attorneys.

But regardless of the underlying circumstances that led to the faulty jury instructions and the improper arguments in this case, the three defendants were entitled to have the jury decide the case based on a correct understanding of the elements of riot. This did not happen.

Instead, the jury was misinstructed on the meaning of "participating with five or more others" and the meaning of "tumultuous" conduct. Thus, the jurors were allowed to convict the defendants of riot without finding that the State had proved all the required elements of that crime.

These errors tended to negate or defeat the arguments that the three defendants raised in their own defense to the riot charge — most notably, the defendants' assertions that they personally did not engage in tumultuous and violent conduct, and that they were not acting in concert with the few number of inmates who may have personally engaged in tumultuous and violent conduct.

When a jury is misinstructed on the elements of the charged crime, the State is generally allowed to show, if it can, that the errors in the jury instructions were harmless beyond a reasonable doubt — *i.e.*, that there is no reasonable possibility that the outcome would have been any different even if the jury had been correctly instructed.[41]   But here, the jury instructions affirmatively misdefined two crucial elements of riot ("participating with" and "tumultuous" conduct) in ways that improperly favored the State.  These instructions improperly allowed the jury to convict the defendants without finding that they acted pursuant to a mutual agreement, and also allowed the jury to convict the defendants based on a finding that their conduct was merely "loud, excited, and chaotic", when the statute required proof that the defendants' conduct created a likelihood of public terror and alarm.

We cannot say that these errors were harmless beyond a reasonable doubt — and we therefore reverse the defendants' convictions for the crime of riot.

*Why we reject Defendant Howard's contention that the riot statute is unconstitutionally vague*

Defendant Howard asserts that the riot statute is unconstitutionally vague because it uses the term "tumultuous" conduct to define the offense.

Howard relies chiefly on the Alaska Supreme Court's decision in *Marks v. Anchorage*, 500 P.2d 644 (Alaska 1972).  In *Marks*, the supreme court struck down a disorderly conduct ordinance which made it a crime for a person to engage in

---

[41]   *Jones-Nelson v. State*, 512 P.3d 665, 676 (Alaska 2022). *But see Jordan v. State*, 420 P.3d 1143, 1159 (Alaska 2018) (holding that when a trial judge wrongfully refuses to instruct the jury on a contested element of a criminal offense, the omission of this contested element is a structural error in the proceedings — *i.e.*, an error that automatically requires reversal of the defendant's conviction).

"tumultuous behavior" when that person was acting with the conscious purpose of causing "public inconvenience, annoyance or alarm" or, alternatively, acting with recklessness as to whether their tumultuous behavior would cause this result.

In *Marks*, there was no legislative history explaining what the ordinance meant by "tumultuous behavior", so the supreme court looked to the dictionary definition of "tumultuous" and concluded that the ordinance punished any conduct that was "noisy" or "disorderly", or that "[evinced] mental or emotional excitement" [42] — a definition of "tumultuous" that is essentially the same definition adopted by the trial court in the present case: "loud, excited, and chaotic".

Having adopted this broad interpretation of what the ordinance meant by "tumultuous behavior", the supreme court in *Marks* then concluded that the ordinance was so broad that it amounted to an unconstitutionally "arbitrary interference with freedom of speech." [43] Relying on the *Marks* decision, Howard argues that the riot statute suffers from the same constitutional infirmity.

But the present case differs significantly from the situation presented in *Marks*. First, as explained by the Alaska Legislature in its commentary to the riot statute, the definition of riot requires proof of conduct that is *both* tumultuous *and* violent — thus precluding any prosecution for riot based on conduct that is solely tumultuous. [44]

---

[42] *Marks*, 500 P.2d at 649.

[43] *Ibid.*

[44] The pertinent portion of the Legislature's commentary reads:

In accordance with recent Alaska Supreme Court decisions emphasizing the importance of safeguarding the exercise of constitutional rights (*see*, *e.g.*, *Poole v. State*, 524 P2d 286 (1974); *Marks v. City of Anchorage*, 500 P2d 644 (1972)), the [new riot] statute requires that the rioter's conduct be tumultuous *and* violent. This

(continued...)

But second, as we have already explained, the legislative history of our riot statute shows that the statute does not use the term "tumultuous" in its popular sense of "loud, excited, and chaotic".  Rather, our statute uses "tumultuous" in its common-law sense of conduct creating a likelihood of public terror and alarm — what the drafters of the Oregon riot statute referred to as "terroristic mob behavior involving ominous threats of personal injury and property damage."

The fact that this interpretation of "tumultuous" is based on legal research and analysis, and that it differs from the everyday meaning of the word, does not mean that "tumultuous" is a vague term.  The words used in a statute are not unconstitutionally vague merely because reasonable people might disagree about their meaning:

> [T]he fact that people can, in good faith, litigate the meaning of a statute does not necessarily (or even usually) mean that the statute is so indefinite as to be unconstitutional.  The question is whether the statute's meaning is unresolvably confused or ambiguous *after* it has been subjected to legal analysis.  If study of the statute's wording, examination of its legislative history, and reference to other relevant statutes and case law makes the statute's meaning clear, then the statute is constitutional.

*De Nardo v. State*, 819 P.2d 903, 908 (Alaska App. 1991) (emphasis in the original).

---

44   (...continued)
element precludes application of the statute to persons exercising constitutionally protected rights of speech and assembly.  Behavior that is merely tumultuous will be insufficient to sustain a conviction under the statute.  (Emphasis in the original.)

*Commentary on the Alaska Revised Criminal Code*, originally published in 1978 Senate Journal, Supplement 47 (June 12th), and republished the following month by the Alaska Legislative Affairs Agency, p. 93.  This document is available online at:
   https://scholarworks.alaska.edu/handle/11122/10755

For these reasons, we reject Defendant Howard's contention that the riot statute is unconstitutionally vague.

*The relationship between the rules of complicity codified in AS 11.16.-110(2) and the riot statute's definition of the offense as six or more people "participating with" each other*

Because the riot statute defines the offense as a mutual enterprise endorsed and acted upon by six or more people, Defendants Burton-Hill and Howard argue that the normal rules of complicity set forth in AS 11.16.110(2) do not apply to the offense of riot — and that it was wrong and confusing for the trial court to instruct the jurors on the rules of complicity. But as we explained earlier, if a riot is occurring and if a bystander, observing the riot, proceeds to encourage or assist the rioters, this person can become an accomplice to the riot under AS 11.16.110(2).

The crucial point is this: Bystanders who observe and encourage acts of tumultuous violence do not become accomplices to a "riot" unless the tumultuous and violent conduct that they are encouraging qualifies as a riot already. To constitute a riot, this tumultuous and violent conduct must be the product of a mutual agreement and joint action by six or more people. Bystanders who are not part of this mutual agreement, and who merely observe and encourage the resulting acts of violence, don't count toward the statutorily required minimum number of participants.

Thus, for instance, if *fewer than six people* mutually agree to engage in tumultuous and violent conduct to achieve a shared purpose, and if they then jointly embark on this agreed-upon course of conduct, and if a bystander observes and encourages the resulting violence, the bystander may become liable as an accomplice for whatever assaults or property crimes the principals commit, but the bystander's encouragement does not augment the number of "participants" for purposes of the riot

statute. That is, the bystander's encouragement does not convert the situation into a riot. *See Scott v. United States*, 1843 WL 3960 at \*4 (Iowa 1843).

If, however, *six or more people* mutually agree to engage in tumultuous and violent conduct to achieve a shared purpose, and if they then jointly embark on this agreed-upon course of conduct, so that a riot is in fact occurring, a bystander who observes and encourages the resulting violence may become liable as an accomplice for the crime of riot.

Accordingly, the rules of complicity codified in AS 11.16.110(2) do apply to prosecutions for riot, and (depending on the facts of the case) it may be proper for a trial judge to instruct the jurors on these rules, so long as the jurors understand that they cannot count encouraging bystanders toward the minimum number of people who must jointly agree to participate in the riot.

\* \* \*

## II. *The defendants' convictions for criminal mischief*

The three defendants in this case were also convicted of third-degree criminal mischief under AS 11.46.482(a)(1) (intentionally and unlawfully damaging property belonging to someone else), based on the damage to prison property that occurred during the disturbance at the Fairbanks Correctional Center.

The State presented no evidence that any of this property damage was directly caused by any of the three defendants. Instead, the prosecutor argued that there were three theories under which the defendants could be held vicariously liable for the property damage that was caused by other people. These three theories were:

1. that the defendants were complicit, as aiders or abettors under AS 11.16.110(2)(B), in the property damage that was allegedly directly caused by their fellow inmate Robert Gentleman,

2. that the defendants were vicariously liable for the property damage that was directly caused by the law enforcement officers who responded to the disturbance on the A Wing, and

3. that, in any case, the defendants (and all the other inmates who refused to leave the A Wing when they were ordered to do so) set events in motion which ultimately resulted in the various types of damage to prison property, and therefore the defendants were vicariously liable for *all* the property damage that ensued — regardless of who caused this damage, or what type of damage it was, or how the damage was caused, and even though the defendants were not complicit in this property damage as aiders or abettors under AS 11.16.110(2)(B).

As we will explain, the jurors in this case did not receive the instructions they needed to properly evaluate the prosecutor's second and third theories. The jury received no instruction on the legal doctrine of proximate causation, and the jury was affirmatively misinstructed on the question of what evidence was legally sufficient to prove that the defendants acted with the conscious aim of causing the various forms of property damage that occurred here.

But before we explain our conclusions on these issues, we need to describe the evidence pertaining to the State's allegations of property damage, and we also need to clarify the elements of the crime of third-degree criminal mischief as defined in AS 11.46.482(a)(1).

*The evidence regarding the various types of property damage that occurred and the costs of repairing or replacing this damaged property*

Because the State pursued three theories of culpability, we will divide our description of the trial evidence into three categories: (1) the evidence pertaining to the property damage allegedly caused by Robert Gentleman, (2) the evidence pertaining to the property damage that was undisputedly caused by law enforcement officers, and (3) the evidence pertaining to all the remaining property damage.

At trial, the State's main evidence regarding the property damage — the types of property damage that occurred, and the cost of repairing or replacing these various items of damaged property — came from the testimony of prison maintenance supervisor Bill Morgan, supplemented by a chart that he had prepared.

As we have explained, the third-degree criminal mischief statute (as it stood at the time of the events in this case) required proof of at least $1000 worth of property damage. According to Morgan, the total cost of repairing or replacing all the property damaged during the disturbance at the Fairbanks Correctional Center was $4868.69.

Viewing the trial evidence in the light most favorable to the State, slightly over $1000 of this damage was attributable to the alleged actions of Robert Gentleman, slightly over $2400 of the damage was attributable to the actions of the law enforcement officers, and slightly over $1000 was attributable to the actions of unidentified inmates. The State's evidence did not explain who caused the remaining $400 of damage.

Bill Morgan also testified that the total cost of the labor involved in property repair, property replacement, and cleaning up the A Wing was an additional $2318.38. But Morgan never explained how this labor cost was divided among the various types of property damage. Because there was no evidence on this point, the jurors had no rational way of apportioning the cost of labor among the various separate

types of damage. The cost of labor would only become relevant to the jury's decision if the jurors concluded that the three defendants were criminally responsible for *all* of the damage that occurred — but in that case, there would be no need for the jurors to consider the cost of labor, since the value of the property damage (by itself) would be well above the $1000 statutory threshold.

Of the various types of property damage that occurred, the prosecutor attributed four types of damage to the actions of inmate Robert Gentleman: (1) damage to a surveillance camera (and its related cabling) that was mounted on the ceiling at the far end of the A Wing corridor, (2) damage to two telephones that were mounted on a nearby wall, (3) damage to a ceiling sprinkler head located in one of the cells, and (4) damage to three cell windows.

(One additional cell window was broken during the disturbance, but it was undisputed that this window was broken by the state troopers because they wanted to provide fresh air to an inmate who tricked them into thinking that he was suffering a medical emergency.)

Based on Bill Morgan's testimony, it cost a total of $1014.81 to repair or replace the surveillance camera, the three cell windows, and the ceiling sprinkler head allegedly damaged by Robert Gentleman. Morgan failed to address the cost of repairing or replacing the two wall telephones, and there was no other evidence regarding this expense.

Turning to the property damage directly caused by the law enforcement officers who responded to the disturbance, the evidence showed that the officers' actions resulted in three types of damage. Two of these types of damage were caused by the residue of the CS gas and pepper balls that the officers deployed to subdue the inmates: (1) the need to repaint the walls of the A Wing, and (2) the need to replace 25 smoke detectors that no longer worked because of chemical residue. In addition, as we just

explained, the state troopers purposely broke one cell window. According to Morgan's testimony, the total cost of buying new paint, new smoke detectors, and one new cell window was $2432.78 — essentially half of the total damage of $4868.69.

Morgan also testified about another type of damage that was caused by the actions of unidentified inmates: the destruction of two locks on one of the cell doors. Morgan did not explicitly say that these cell door locks were damaged by inmates, but he did say that the locks were broken when unidentified people tried to dislodge the cell door by kicking it outward (*i.e.*, kicking it toward the corridor from *inside* the cell). The reasonable inference was that one or more inmates took refuge in the cell after the A Wing corridor was saturated with chemical agents, and that they later tried to get out of the cell by kicking the door open after they discovered that the door had locked behind them. Morgan testified that the cost of replacing these two cell door locks was slightly over $1000. (It was $1015.82, to be precise.)

Finally, Morgan testified that 16 cell door hinges had to be replaced, and that the total cost of the replacement hinges was $405.28. No testimony was ever presented as to how these cell door hinges came to be broken, or who might have broken them. Conceivably, this damage may have occurred when unidentified inmates tied opposing pairs of cell doors together to form partial barricades across the width of the A Wing — or, conceivably, this damage may have occurred when corrections officers and their SORT team allies worked to free these pairs of cell doors in order to re-open the corridor. Or, conceivably, some of the hinges were broken by inmates and some by the officers.

*The elements of third-degree criminal mischief as charged in this case*

The defendants were charged with third-degree criminal mischief under AS 11.46.482(a)(1). This statute defines the crime as having five elements:

- the defendant engaged in conduct that resulted in damage to property belonging to someone else;
- when the defendant engaged in this conduct, the defendant acted with the intention — *i.e.*, with the conscious objective — of damaging the other person's property;
- the defendant had no legal right to damage this property;
- the defendant had no reasonable ground to believe that they had a right to damage this property; and finally
- the amount of damage equaled or exceeded a specified threshold value. (At the time of the events in this case, that threshold value was $1000.)

It is important to note that this statute does not define third-degree criminal mischief in terms of a particular type of conduct (*e.g.*, throwing a rock, wielding an axe, or defacing an object with paint). Rather, the statute defines the crime as any conduct that causes a particular *result*: damage to property that belongs to someone else.

(In this respect, the third-degree criminal mischief statute is analogous to various provisions of our murder and manslaughter statutes which define the *actus reus* of the offense solely in terms of causing a particular result — human death.[45])

But in addition to requiring proof that the defendant's conduct unlawfully caused damage to someone else's property, the statute requires proof that the defendant

---

[45] *See* AS 11.41.100(a)(1)(A) (first-degree murder), AS 11.41.110(a)(1) (second-degree murder), and AS 11.41.120(a)(1) (manslaughter).

acted *intentionally* with respect to this result — *i.e.*, that it was the defendant's conscious objective to cause damage to the other person's property.

(See AS 11.81.900(a)(1), which defines what it means for a person to act "intentionally" with respect to a result specified in a provision of the criminal code. Under this statute, a person acts intentionally with respect to a result "when the person's conscious objective is to cause that result", although this objective need not be the person's sole objective.)

This brings us to another important point: Even when (as in the present case) a defendant is charged with committing criminal mischief through the physical acts of some other person, the State is still required to prove that the defendant *personally* acted with the required culpable mental state — *i.e.*, the conscious goal of damaging the other person's property. This culpable mental state must be proved regardless of whether the defendant is charged with damaging the other person's property through the defendant's own actions, or through the actions of an accomplice under AS 11.16.110(2), or through the actions of any other person.

While the provisions of Alaska's vicarious liability statute, AS 11.16.110, define various situations in which one person can be held accountable for another person's *conduct*, there is no provision of Alaska law that makes one person accountable for another person's culpable mental state. Even when two or more people are complicit in the same criminal conduct, the State must separately prove each person's individual culpable mental state — and when the jury decides whether a particular person acted with the culpable mental state(s) required by the charging statute, the jurors must evaluate that person's mental state separately.

We discussed this point of law in *Riley v. State*, 60 P.3d 204, 210, 214–15, 220–21 (Alaska App. 2002). As we explained in *Riley*, the drafters of Alaska's criminal code adopted the approach of the Model Penal Code — an approach which "reject[ed]

the notion that an accomplice should be held accountable for any and all objectively foreseeable results of the principal's conduct". Instead, "even though several defendants are accountable for the same criminal conduct ... , each defendant's level of culpability with respect to the *results* of that conduct must be assessed separately, based on each individual's culpable mental state". *Riley*, 60 P.3d at 214 (emphasis added).

We later summarized this point of law in *Andrew v. State*, 237 P.3d 1027, 1036 (Alaska App. 2010), where we stated that the guilt of any particular defendant must be judged by assessing (1) that defendant's own culpable mental state, plus a combination of (2) that defendant's own conduct and (3) the conduct of any other person for which the defendant is accountable under a provision of AS 11.16.110.

*The State's second and third theories of why the defendants were vicariously liable for the different types of property damage on the A Wing, and the jury instruction errors pertaining to those theories*

As we have already noted, there was no evidence that any of the three defendants personally damaged any prison property during the disturbance on the A Wing.[46] The prosecutor acknowledged as much to the trial court. Nevertheless, the prosecutor argued that the three defendants could be convicted of criminal mischief because they were vicariously liable, under various legal theories, for all the property damage that was inflicted by other people.

As we have already mentioned, the prosecutor's initial theory of vicarious liability was that all three of the defendants purposely aided or abetted their fellow

---

[46] There was evidence that one of the three defendants, Marcus Howard, may have removed a mop head from its handle, but the prosecutor never presented any evidence that the removal of this mop head caused physical damage to the mop, or that the prison had to spend money to repair or replace the mop or its handle.

inmate Robert Gentleman's alleged acts of property damage, and thus the defendants were criminally liable for that damage as aiders or abettors under AS 11.16.110(2)(B).

(AS 11.16.110(2)(B) declares that someone who aids or abets another person's criminal conduct, acting with the intent to promote or facilitate that criminal conduct, is vicariously liable for that conduct.)

This "aiding or abetting" theory of culpability was the sole theory that the prosecutor argued to the trial judge when the three defendants sought judgements of acquittal at the conclusion of the State's case-in-chief. But the litigation of this case took a new turn when the trial court denied the defendants' motions for judgements of acquittal — because the trial court did not base its ruling on the prosecutor's theory that the defendants aided or abetted Robert Gentleman's alleged acts of property damage. Rather, the court relied on a different theory of liability.

The trial court ruled that the State's case was sufficient to go to the jury because the evidence showed that, as a legal matter, the defendants had *personally* "caused" the property damage that was directly caused by the law enforcement officers when they deployed CS gas and pepper balls to subdue the inmates.

The court declared that "the big picture here" was that each of the defendants (and, indeed, all the inmates who refused to leave the A Wing) had engaged in conduct that was "directed toward [eliciting] a response" from law enforcement officers — a response "that would involve [all] this pepper spraying". The court further asserted that it was the inmates' conscious intention — their "entire goal" — to provoke the officers "to come in [and] cause the damage to the property". Based on this analysis, the court denied the defense motions for judgements of acquittal.

(The trial court's remarks are phrased as if they constituted findings of fact, but we assume that the court meant only that the State's evidence could potentially *support* such findings by the jury.)

2802

The next day, while the parties were discussing jury instructions, the court re-affirmed and clarified this new theory of vicarious liability.

During that discussion, Marcus Howard's attorney asked the trial court if its ruling applied, not just to the damage that could be attributed to the officers' use of chemical agents (*i.e.*, the need to repaint the walls and replace the smoke detectors), but also to the cell window that was broken by the state troopers when an inmate feigned a medical emergency. In response to the attorney's question, the trial court declared that its ruling was broad enough to encompass all the damage caused by the officers (including the window damage), because the State's evidence was sufficient to prove that all the inmates who engaged in the disturbance on the A Wing did so with the conscious purpose of having the officers destroy prison property.

The court then expressly ruled that the prosecutor could argue this new theory of vicarious liability when he presented his summation to the jury.

But in fact, when the prosecutor delivered his summation to the jury, he expanded this second theory of vicarious liability into a new and broader third theory.

In his new third theory, the prosecutor argued that any inmate who refused to leave the A Wing was criminally accountable for *any and all* property damage that ensued — regardless of whether that damage was directly attributable to the actions of Robert Gentleman, or directly attributable to the actions of law enforcement officers, or attributable to the actions of unidentified inmates, or even if there was no evidence explaining how this damage occurred. The prosecutor told the jurors:

> It didn't have to go this way. ... [All of this] happened because these [defendants] wanted it to happen. They were pissed off. They wanted to express [their anger] violently; they wanted to defy correctional officers and act in this way. And they [thereby] created all of that damage and all of that risk [of injury] that you [have] heard about.

. . .

> [The disturbance at the prison] required many dozens of officers from the Alaska State Troopers and from the Fairbanks Police Department to respond. ... All of this damage — all of the broken windows, the sprinkler heads, the pepper spray stains, the broken paint, the broken door handles and locks, the hinges, the fire suppressant detectors [*sic*] — all of that rests at the feet of these [defendants].

> It was a petty, senseless act of defiance — an intentional act by folks who weren't happy about things [but] who weren't able to express it appropriately, and [who] would prefer to damage property[.] ... These men are ... guilty of criminal mischief in the third degree.

In other words, the prosecutor told the jurors that even if the State failed to prove that the defendants were complicit in the property damage allegedly caused by Robert Gentleman, this did not matter — because the defendants' mere refusal to leave the A Wing rendered them vicariously liable for any and all property damage that ensued, no matter what kinds of property were damaged, and no matter who caused this damage or how the damage occurred, and even though the defendants had not aided or abetted this property damage for purposes of AS 11.16.110(2)(B).

As we will discuss, the prosecutor's second and third theories of vicarious liability raised significant questions as to whether the defendants' refusal to leave the A Wing constituted a "proximate" (or "legal") cause of all the property damage that occurred later. But the jurors received no instructions on that issue.

Moreover, even assuming that the defendants' refusal to leave the A Wing might be found to be a proximate cause of all the various types of property damage that occurred later, the State was still required to prove that the defendants acted with the culpable mental state specified in the criminal mischief statute. That is, the State was

required to prove that, when the defendants refused to leave the A Wing, they did so with the conscious goal of causing all this property damage.

*How the law of proximate causation applied to this case, and why the trial court was required to instruct the jurors on this law*

"Proximate causation" is the legal doctrine that both defines and limits the scope of a person's responsibility for the consequences of the events that they helped to set in motion, or that they later contributed to. This doctrine was particularly important in the present case for two reasons.

First, the prosecutor argued to the jury that when the defendants refused to leave the A Wing, the defendants "caused" (as a legal matter) all the property damage that later occurred as the result of other people's actions (law enforcement officers and other inmates) — no matter what kinds of property were damaged, and no matter who caused this damage or how the damage occurred. Without instruction on the law of proximate causation, the jurors would be unable to properly evaluate the prosecutor's contention.

Second, the crime of third-degree criminal mischief as defined in AS 11.46.482(a)(1) is a specific intent crime. The State was required to prove that, when the defendants refused to leave the A Wing, they did so with the conscious objective of having these other people cause this damage to prison property. And the law of proximate causation is more exacting in cases where the charging statute requires the State to prove that a defendant acted with a specified intent.

In such cases, even if the State proves that the defendant's conduct was a *factual* cause of the prohibited injury or damage (here, the damage to someone else's property), the law of proximate causation requires the State to prove (1) that the *type* of

injury or damage that actually occurred was sufficiently similar to the type of injury or damage that the defendant intended, and (2) that this injury or damage occurred *in a manner* that was sufficiently similar to the manner in which the defendant intended to cause the injury or damage.

See the discussion of this topic in Wayne R. LaFave, *Substantive Criminal Law* (3rd edition, 2023 update), § 6.4 and its various subsections. As explained in *LaFave*, when a defendant is charged with a specific intent crime, issues of proximate causation "[can] arise when the actual result of the defendant's conduct varies from the result which the defendant intended ... . The variance may be (1) as to the person or property harmed, or (2) as to the manner in which the harm occurs, or (3) as to the type or degree of the harm." *Id.*, § 6.4(c).

The evidence in the present case presented several issues of proximate causation.

Most of the damage attributable to the law enforcement officers — *i.e.*, the need to replace 25 smoke detectors and the need to repaint the walls, at a total cost of $2293.10 — was the indirect result of the large amount of CS gas and pepper balls that the officers lobbed into the A Wing to incapacitate the inmates.

It may indeed have been foreseeable (as the trial court remarked when the court denied the defendants' motions for judgement of acquittal, and as the prosecutor later argued to the jury) that if the inmates refused to leave the A Wing, law enforcement officers would deploy CS gas and pepper balls to subdue the inmates. According to the evidence, the inmates were familiar with this tactic because the prison staff frequently deployed chemical agents against the inmates — once every two weeks, on average.

Indeed, the evidence showed that many of the inmates took the precaution of covering their faces with towels and shirts in anticipation that the officers would deploy these chemical agents. And the evidence was undisputed that these chemical

agents did in fact cause damage to the paint on the A Wing and to the smoke detectors on the ceiling.

Given this evidence, it was reasonable for the jurors to conclude that the inmates who refused to leave the A Wing anticipated that the corrections officers and their law enforcement allies would deploy chemical agents to incapacitate the inmates and re-assert control over the A Wing. But there was no evidence that either the law enforcement officers or the inmates anticipated, or could reasonably have predicted, that the use of these chemical agents would cause these particular types of damage to prison property.

Even though the prison staff frequently deployed chemical agents against the inmates, there was no testimony that these chemical agents had previously caused damage to prison property, or that the officers who deployed these chemical agents in the present case knew — or even suspected — that these chemical agents would damage the paint or the smoke detectors. More importantly, there was no testimony that *the defendants* understood that the officers' deployment of these chemical agents would, or even might, cause these types of damage.

Thus, the evidence suggests that there may have been a significant disparity between the types of property damage that the inmates might have anticipated or envisioned and the two types of property damage that were later actually caused by the law enforcement officers.

(Remember that the dollar value of the damage to the paint and the smoke detectors constituted nearly half of the total damage to prison property.)

We now turn to the one other item of property damage that was clearly caused by law enforcement officers — the state troopers' act of intentionally breaking one of the A Wing's cell windows in response to a feigned medical emergency.

The inmates' refusal to leave the A Wing prompted the law enforcement officers to deploy the chemical agents, and the officers' deployment of the chemical agents was obviously a link in the chain of factual causation that led to this breaking of the cell window. But the immediate causes of the damage to the window were (1) the two inmates' decision to feign a medical emergency and (2) the state troopers' decision to introduce fresh air into the cell by breaking the window. These circumstances raised a significant question of proximate causation: a question as to whether the damage to this cell window occurred in a manner that was sufficiently similar to what the inmates may have anticipated or intended.

And finally, issues of proximate causation were inherently raised by the entire premise of the State's third theory of vicarious liability — the prosecutor's contention that, merely by refusing to leave the A Wing, the three defendants (and all the other inmates who refused to leave) became criminally responsible for any and all property damage that ensued, regardless of who actually caused this damage, or what type of damage it was, and regardless of how the damage was caused.

It is undisputed that the three defendants were among the inmates who refused to leave the A Wing, and it was likewise undisputed that the inmates' refusal to vacate the A Wing led to a series of events in which several types of prison property were damaged in one way or another. But given the types of property damage that occurred here, and given the manner in which that property damage occurred, one cannot simply assume that the defendants' refusal to leave the A Wing was a proximate cause of all this damage.

These questions of proximate causation were first injected into this case when the trial court denied the defendants' motions for judgement of acquittal based on the theory that the defendants' refusal to leave the A Wing could be viewed as a legal cause of all the property damage that was later physically caused by the law enforcement

officers. And as we have explained, the prosecutor later elaborated on this theory by expressly arguing to the jury that, simply because the defendants refused to leave the A Wing, the defendants became criminally responsible for *all* of the property damage that later occurred — no matter what kinds of property were damaged, and no matter who caused this damage or how the damage occurred.

In making this argument, the prosecutor relied on (and amplified) the trial court's earlier ruling — the ruling that if the three defendants willingly participated in the refusal to leave the A Wing, then the defendants were guilty of "causing" all of the ensuing damage to prison property. As the trial court explained, the theory behind its ruling was that the inmates' resistance to the move evoked a "necessary police response", and thus there was "a direct causal link" between the defendants' refusal to leave the A Wing and the ensuing damage to prison property, even if that property damage was physically caused by law enforcement officers.

We have significant doubts whether the drafters of Alaska's criminal mischief statutes intended such a broad interpretation of what constitutes "causation" for purposes of the criminal mischief statutes. The trial court essentially ruled that whenever the police cause property damage during their efforts to apprehend a criminal suspect — *e.g.*, breaking down a door, cutting through a fence, damaging a patrol car, or causing any other type of property damage while engaged in a reasonable response to the suspect's behavior — the suspect can later be convicted of criminal mischief based on this property damage (in addition to whatever other crimes led the police to make the arrest). But we need not resolve this question here, for two separate reasons.

First, even if the trial court's broad interpretation of causation was correct, it was nevertheless a jury question whether the defendants' actions were a proximate cause of the various forms of property damage in this case. Thus, it was incumbent on

the trial court to instruct the jurors on the law of proximate causation — and it was plain error for the court to fail to provide the jurors with this information.

We note that Alaska Criminal Pattern Jury Instructions 1.25.1 and 1.25.2 deal with the issues we have been discussing. We do not say that the wording of these two pattern instructions is necessarily adequate to explain all of the issues of proximate causation that are raised in this case, but these instructions are at least a starting place.

Second, as we are about to explain, we must reverse the defendants' criminal mischief convictions because the jury received a prejudicially misleading instruction on a different element of the offense: the requirement that a defendant act with the conscious objective of causing the property damage.

*The State's burden to prove that the defendants acted with the conscious objective of damaging the prison property in this case — and how the jury's consideration of this issue was prejudiced by the trial court's erroneous instruction that people "ordinarily" intend the natural and probable consequences of their actions*

To prove the defendants guilty of third-degree criminal mischief under AS 11.46.482(a)(1), the State not only had to prove that the defendants' actions were a proximate cause of the property damage that occurred here, but also that the defendants acted "intentionally" with respect to this property damage — *i.e.*, that they acted with the conscious objective of causing this damage. See AS 11.81.900(a)(1), the criminal code's definition of acting "intentionally".

Because the criminal mischief statute declares that this crime is committed only when a defendant has *intentionally* damaged another person's property, it was not enough for the State to prove that the three defendants acted negligently with respect to the property damage that occurred in this case — *i.e.*, to prove that the property damage

was a foreseeable consequence of the defendants' conduct, and that the defendants unreasonably failed to perceive this risk. (See AS 11.81.900(a)(4), the definition of acting with "criminal negligence".)

Nor was it enough for the State to prove that the three defendants acted recklessly with respect to this property damage — *i.e.*, to prove that the property damage was a foreseeable consequence of the defendants' conduct, and that the defendants were consciously aware of this risk but they unreasonably ignored it. (See AS 11.81.-900(a)(3), the definition of acting "recklessly".)

Indeed, it was not enough for the State to prove that the defendants knew that this property damage was a likely consequence (or even a substantially certain consequence) of their conduct, so long as there was a reasonable possibility that the defendants remained personally indifferent as to whether this damage occurred or not. Rather, the State had to prove beyond a reasonable doubt that the three defendants acted with the conscious aim of causing the various kinds of property damage that occurred here.

This was one of the major disputed issues at trial: The prosecutor argued that, merely by refusing to leave the A Wing when they were ordered to do so, the defendants caused (as a legal matter) all of the property damage that occurred in this case, and thus the defendants could be convicted of third-degree criminal mischief based on this property damage. In response, the defense attorneys pointed out that the charge of criminal mischief required proof that the defendants had acted with the conscious objective of causing all of this property damage — and the defense attorneys asserted that the State had failed to prove this element of the offense.

The defendants now raise this same contention on appeal — the contention that the evidence was not sufficient to prove that they acted "intentionally" with respect to the property damage.

As we will explain, we conclude that the State presented sufficient evidence to prove that the defendants, as aiders or abettors, acted "intentionally" with respect to the property damage that was allegedly caused by their fellow inmate Robert Gentleman. But this portion of the property damage amounted to only about one-fifth of the total property damage in this case — a little over $1000 of damage out of a total of almost $4900. And there is no way to tell whether the jury's verdicts were based on this portion of the property damage.

It is impossible to know the precise basis of the jury's verdicts because, in his summation to the jury, the prosecutor argued three different theories as to why the defendants could be found guilty of criminal mischief, and the jurors were not asked to explain the basis for their verdicts.

### (a) A more detailed look at how the issue of the defendants' intent was litigated at trial

With regard to the property damage allegedly caused by Robert Gentleman, the prosecutor introduced evidence tending to show that the three defendants were aware of, and purposely aided or abetted, Gentleman's alleged acts of property damage. In his summation to the jury, the prosecutor argued that this evidence showed that *Robert Gentleman* was "the one who [was] doing ... damage intentionally to the wing", and that the three defendants were complicit in this damage because they purposely aided or abetted Gentleman's actions.

But with regard to all the other property damage in this case (the various types of property damage that were caused by law enforcement officers or by inmates other than Robert Gentleman), the prosecutor offered little evidence suggesting that the defendants acted with the culpable mental state required by the criminal mischief statute

— *i.e.*, evidence that each of the three defendants consciously hoped that these types of property damage would occur if they refused to leave the A Wing.

For example, even though there was substantial evidence that the protesting inmates knew it was likely that corrections officers and their law enforcement allies would deploy CS gas and pepper balls to subdue the inmates and regain physical control of the A Wing, there was no evidence that either the officers or the inmates were aware that this deployment of chemical agents would (or even might) damage the paint and the smoke detectors in the A Wing (damage that constituted almost half of the total). As we noted earlier in this opinion, there was testimony that corrections officers often used these chemical agents to control the inmates — on average, once every two weeks — but there was no evidence that these chemical agents had previously caused damage to the paint or to the smoke detectors or, indeed, to any other prison property.

Moreover, even assuming that the defendants were aware of the *possibility* that these chemical agents would damage the paint or the smoke detectors, that was not the question that the jurors had to answer. Rather, the question was whether the defendants' refusal to leave the A Wing was motivated by the *conscious goal* of having these chemical agents cause this property damage.

The same thing is true with respect to all the other property damage that occurred in this case: the troopers' act of breaking a cell window to provide fresh air to an inmate who appeared to be suffering a medical emergency, the unknown inmates' destruction of two locks on one of the cell doors, and the unexplained damage to 16 cell door hinges. Again, the question is not whether the defendants might reasonably have anticipated that these types of property damage would occur. Rather, the question is whether, when the defendants refused to leave the A Wing, they acted with the conscious goal of causing these types of damage.

In the prosecutor's summation to the jury, he asserted that the defendants had purposely aided or abetted Robert Gentleman's alleged acts of property damage, but he made no similar other assertions about the defendants' conscious goals with respect to the remaining four-fifths of the property damage — the damage which, according to the evidence, was caused by the law enforcement officers, or was caused by other inmates, or whose cause went unexplained. Instead of citing any evidence that the defendants had intended to cause this damage, the prosecutor focused on the issue of causation — the fact that the inmates had "intentionally" (*i.e.*, knowingly)[47] refused to leave the A Wing when they were ordered to do so, and that the inmates' refusal to leave the A Wing had led to all of the property damage:

> It didn't have to go this way. ... [All of this] happened because these [defendants] wanted it to happen. They were pissed off. They wanted to express [their anger] violently; they wanted to defy correctional officers and act in this way. And they [thereby] created all of that damage and all of that risk [of injury] that you [have] heard about.
>
> . . .
>
> [The disturbance at the prison] required many dozens of officers from the Alaska State Troopers and from the Fairbanks Police Department to respond. ... All of this damage — all of the broken windows, the sprinkler heads, the pepper spray stains, the broken paint, the broken door handles and locks, the hinges, the fire suppressant detectors [*sic*] — all of that rests at the feet of these [defendants].

---

[47] See *Stoner v. State*, unpublished, 2016 WL 1394221 at *4–7 (Alaska App. 2016) (Judge Mannheimer, concurring), explaining that while people colloquially speak of a person "intentionally" engaging in conduct, Alaska's criminal code uses the word "knowingly" to describe this concept of "witting, non-accidental conduct". "Intentionally", on the other hand, is used only to describe a person's conscious goal of achieving a particular result.

It was a petty, senseless act of defiance — an intentional act by folks who weren't happy about things [but] who weren't able to express it appropriately, and [who] would prefer to damage property[.] ... These men are ... guilty of criminal mischief in the third degree.

*(b) How the jury's consideration of the culpable mental state element of criminal mischief was prejudiced by the trial court's instruction that people "ordinarily" intend the natural and probable consequences of their actions*

We will now explain how one of the trial court's instructions to the jury prejudiced the jurors' consideration of the culpable mental state element of criminal mischief.

As we have just noted, the prosecutor argued to the jury that the defendants were guilty of criminal mischief because their act of refusing to leave the A Wing set in motion a series of events that led to all of the property damage in this case. But the fact that a defendant's conduct ultimately leads to a particular result is not proof that the defendant consciously intended to cause that result.

For instance, if the prohibited result was not foreseeable to the defendant or to a reasonable person in the defendant's position, then the defendant would not have acted with any culpable mental state at all. And even if the result would have been foreseeable to a reasonable person in the defendant's position, but the defendant failed to perceive this risk, the defendant would have acted only "negligently" with respect to this result — not "intentionally".[48] Similarly, even if the defendant was subjectively

---

[48] Compare AS 11.81.900(a)(4) (the definition of acting with "criminal negligence") and AS 11.81.900(a)(1) (the definition of acting "intentionally").

aware of the risk and consciously ignored it, this would only prove that the defendant acted "recklessly" with respect to the prohibited result, not "intentionally".[49]

The fact that a person may have acted negligently or recklessly — *i.e.*, the fact that a person's actions may foreseeably have led to harmful consequences — does not necessarily mean that the person consciously intended those consequences to occur. In fact, life is filled with examples of people who engage in conduct — for example, never refusing a second helping of dessert, or repeatedly telling other people exactly what they think of them — not from any desire to bring about the natural and probable consequences of this conduct, but rather *in spite of* those foreseeable consequences.

But at the prosecutor's request, the trial court gave the jurors an instruction that endorsed and ratified the prosecutor's argument that foreseeability was proof of intent.

This instruction told the jurors that it was "reasonable [for them] to infer" that a person "ordinarily intends the natural and probable consequences" of their actions — and that the jurors could properly rely on this "reasonable inference" when they decided whether "the prosecution [had] proved beyond a reasonable doubt that the defendant[s] possessed the required intent."

In effect, this instruction told the jurors that when the evidence shows that a person acted negligently with respect to a result specified in a criminal statute — *i.e.*, when, viewed in retrospect, the person's actions would foreseeably ("naturally and probably") lead to a result that is prohibited by the statute — then the jurors can properly infer that this person "ordinarily" will have acted with the conscious goal of causing the prohibited result.

---

[49] Compare AS 11.81.900(a)(3) (the definition of acting "recklessly") and AS 11.81.-900(a)(1) (the definition of acting "intentionally").

In other words, according to this instruction, proof of a defendant's *negligence* is prima facie evidence of the defendant's *conscious goal* — "prima facie" in the sense that nothing more is legally required to support a jury finding that the defendant acted "intentionally" with respect to the prohibited result. Thus, if the jurors in this case concluded, in retrospect, that the various types of damage to prison property that occurred here were "natural and probable consequences" of the defendants' refusal to leave the A Wing, this jury instruction authorized the jurors to find that the defendants acted with the conscious objective of causing all of this damage, unless the jurors concluded that there was something unusual — something non-"ordinary" — about the situation.

This jury instruction allowed the prosecutor to improperly argue, and it allowed the jurors to improperly find, that the three defendants acted with the conscious goal of causing all of the property damage in this case simply because (1) they refused to voluntarily leave the A Wing, and that, as a result, (2) it was reasonably foreseeable that law enforcement officers would take forcible action to re-assert control over the A Wing, and (3) prison property would then be damaged in one or more of the various ways that occurred in this case.

> *(c) Why, as a matter of law, it is wrong to assert that people "ordinarily" intend the natural and probable consequences of their actions*

As we have already noted, people often engage in conduct that will foreseeably lead to consequences that the person does not want. An illustration of this truth is found in *State v. Malone*, 819 P.2d 34, 35–39 (Alaska App. 1991).

The defendant in *Malone* fled the scene of a traffic stop, prompting the police officer to initiate a high-speed chase. During this chase, the police officer's car

collided with a vehicle driven by a third-party motorist, resulting in injuries to both the officer and the motorist. Based on this incident, Malone was indicted on charges of first-degree assault (reckless infliction of serious physical injury by means of a dangerous instrument) and third-degree assault (reckless infliction of non-serious physical injury by means of a dangerous instrument).[50]

Malone's case came to this Court in a pretrial posture, after the superior court struck down Malone's indictment on the ground that the pursuing officer might have driven carelessly, and this negligent driving might have been a "superseding cause" of the injuries.[51] Thus, the issue presented in *Malone* was an issue of causation, not culpable mental state.

But even though the *Malone* decision dealt with an issue of causation, the facts of *Malone* illustrate the importance of the culpable mental state distinctions that we have been describing.

As this Court explained in *Malone*, a defendant can be held criminally accountable for injuries that were physically ("directly") caused by other people's conduct if those people were responding in a foreseeable way to the defendant's own misconduct.[52] Thus, for instance, the defendant in *Malone* might conceivably have been found guilty of a criminal homicide if either the police officer or the third-party motorist had died as a result of the high-speed chase. But this criminal homicide would not have been a first-degree murder — because the offense of first-degree murder requires proof that the defendant acted with the conscious objective of causing human death.

---

[50] *Malone*, 819 P.2d at 35.

[51] *Id.* at 35–36, 39.

[52] *Id.* at 36–37.

The defendant in *Malone* probably understood that, if he fled the scene of the traffic stop, the police officer would likely pursue him. At a minimum, the police officer's pursuit was a foreseeable consequence of Malone's act of fleeing the scene. But it would be an unusual case if Malone wanted the officer to chase him — *i.e.*, unusual if Malone acted with the conscious objective of having the officer chase him.

More importantly, even though it may have been foreseeable that the police officer would chase Malone if he fled the scene, and even though it may have been foreseeable that this high-speed pursuit might result in injury or even death to one or more people, the record in *Malone* contained no evidence suggesting that Malone acted with the conscious objective of having someone injured or killed. At best, the record supported the conclusion that Malone may have negligently (or perhaps even recklessly) ignored a substantial and unjustifiable possibility that his act of fleeing might ultimately lead to someone's injury or death.[53]

Thus, if the high-speed chase in *Malone* had in fact led to someone's death, Malone might have been prosecuted for criminally negligent homicide or perhaps manslaughter. But this homicide would not have been an intentional murder, because there was no evidence that Malone acted with the conscious objective of killing anyone.

The same principle applies to the present case. Even assuming that it was reasonably foreseeable that the three defendants' refusal to leave the A Wing might lead to one or more of the various types of property damage that occurred here, the defendants would not be guilty of third-degree criminal mischief unless the State proved that the defendants acted with the culpable mental state specified in the criminal mischief statute — *i.e.*, proved that the defendants acted with the conscious aim of causing these types of property damage.

---

[53] *See id.* at 37–38.

*(d) Why we now disapprove this jury instruction*

At the time of the trial in this case, the jury instruction that we have been discussing was part of Alaska's Criminal Pattern Jury Instructions. (It was former Criminal Pattern Instruction 1.44.) Since then, this instruction has been removed from the pattern instructions. Currently, the applicable pattern instruction is the more neutral Pattern Instruction 1.15 — an instruction which makes no comment about what people "ordinarily" intend.

Nevertheless, we acknowledge that the wording of this former pattern instruction has been approved several times, both by the Alaska Supreme Court and by this Court. In fact, in *Kangas v. State*, this Court declared that this instruction was "a correct statement of the law."[54]

But in those prior appellate cases, the factual question presented to the jury was whether the defendant acted "intentionally" with respect to the direct, immediate, and seemingly inevitable consequences of their own personal actions — for example, whether the defendant intended the natural and probable consequences of their own act of shooting another person[55] or their own acts of inducing another person to sign a false affidavit and, later, submitting this false affidavit to the authorities.[56] These deceivingly straightforward factual contexts masked an underlying flaw in the jury instruction.

When this jury instruction declares that jurors may reasonably infer that people "ordinarily" intend the "natural and probable consequences" of their actions, what the instruction is talking about is the idea that one reasonable way to assess a person's

---

[54] *Kangas v. State*, 463 P.3d 189, 194 (Alaska App. 2020).

[55] *See Calantas v. State*, 608 P.2d 34, 36 (Alaska 1980) (on rehearing); *Kangas*, 463 P.3d at 193–95.

[56] *Gargan v. State*, 805 P.2d 998, 1005–06 (Alaska App. 1991).

conscious goal — *i.e.*, the person's conscious reason for taking a particular action — is to examine what that person already knew about the natural and probable consequences of the action they were contemplating. If the person understood that their contemplated action would "naturally and probably" lead to a particular result, and if, acting with this knowledge, the person proceeded to engage in the contemplated action, then this combination of prior awareness and ensuing action might reasonably be viewed as evidence that the person consciously intended to cause that result.

Take, for example, a case where a defendant has shot or stabbed another person, and the jury is asked to decide whether the defendant consciously intended the direct consequences of this shooting or stabbing (*i.e.*, the other person's injury or death). In such cases, if the jurors conclude that the defendant acted with full awareness of the consequences that normally flow from the act of shooting or stabbing another person, then the jurors might reasonably infer that the defendant's prior knowledge of these "natural and probable consequences", coupled with the defendant's decision to proceed with the contemplated shooting or stabbing, justify the inference that the defendant intended to accomplish these "natural and probable" consequences when the defendant proceeded to shoot or stab the other person.

But it is crucial to note that the validity of this inference hinges on the fact that the person who performed the shooting or stabbing was consciously aware, before they acted, that their contemplated action would naturally and probably lead to the other person's injury or death. It is not enough for the government to show that, assessing things in retrospect, a reasonable person in the defendant's situation would have understood that the defendant's contemplated action would naturally and probably lead to someone else's injury or death. That would be proof of the defendant's *negligence*, not the defendant's conscious objective.

The problem with the "ordinarily intends" jury instruction is that the wording of the instruction is misleading on this crucial point. The instruction fails to explain that the inference of intent is potentially reasonable only if the jurors are convinced that the defendant was *consciously aware* of the "natural and probable" consequences of their contemplated action *before* they acted. Instead, the instruction invites the jurors to assess for themselves, in retrospect, what the "natural and probable consequences" of the defendant's action were — and then to decide the defendant's case under the assumption that people "ordinarily" consciously intend the natural and probable consequences of their actions.

Thus, under this instruction, if jurors conclude (in retrospect) that a defendant's action "naturally and probably" led to the result that occurred in the case — basically, if the jurors conclude that the defendant acted negligently with respect to this result — then the jurors are authorized to find (based on this and nothing more) that the defendant acted with the *conscious goal* of causing this result.

By authorizing jurors to make a finding of intent in these circumstances, this jury instruction undermines the legal distinction between negligence or recklessness, on the one hand, and intent (conscious objective) on the other. And by telling jurors that it is reasonable to assume that people "ordinarily" intend the natural and probable consequences of their actions, the instruction makes it sound as if jurors are always allowed to conclude that a negligent defendant acted, not just negligently, but "intentionally" with respect to the foreseeable results of their conduct unless the defendant introduces affirmative evidence that their situation was, for some reason or other, not "ordinary".

In the present case, these flaws in the jury instruction allowed the prosecutor to improperly argue that the three defendants could be convicted of criminal mischief based on *all* the property damage that occurred here (no matter who physically

caused this damage, or what type of damage it was, and no matter how it was caused) so long as the State merely proved that the defendants acted negligently with respect to this property damage — *i.e.*, if the State merely proved that the property damage was a "natural and probable" result of the defendants' refusal to leave the A Wing.

By giving the flawed jury instruction, the trial court endorsed the prosecutor's improper argument — because, according to this instruction, the State's proof of the defendants' negligence, standing alone, was legally sufficient to justify the jurors in finding that the defendants consciously intended to cause all this property damage.

For these reasons, we now retract our assertion in *Kangas* that this jury instruction is a "correct statement of the law." This instruction is not a correct statement of the law — and we now formally disapprove this instruction.

*Our conclusion with respect to the defendants' convictions for criminal mischief*

We have identified two major flaws in the way the criminal mischief charge was litigated. Both of these flaws involve the State's second and third theories of culpability — the prosecutor's assertions that the three defendants, simply by refusing to leave the A Wing, became criminally liable for all of the damage to prison property that later occurred, no matter what kinds of property were damaged, and no matter who caused this damage or how the damage occurred.

First, the trial court failed to instruct the jurors on the law of proximate causation, even though the jurors could not meaningfully evaluate the State's theories without instruction on this area of the law.

And second, the trial court erroneously instructed the jurors that they could reasonably find that the defendants acted with the conscious objective of causing all the various types of property damage in this case if, viewing events in retrospect, the jurors concluded that these various types of property damage were all "natural and probable" consequences of the inmates' refusal to leave the A Wing — in other words, if the jurors concluded that the defendants acted negligently with respect to this property damage.

When the jury found the three defendants guilty of criminal mischief, the jurors were not asked to specify which of the State's three theories of vicarious liability the jurors found to be proved. It is therefore possible that the jurors relied solely on the State's second or third theories of vicarious culpability.

In other words, the jurors may have found the defendants guilty of criminal mischief even though the jurors concluded that the State had failed to prove its allegation that the defendants were complicit in the property damage allegedly caused by Robert Gentleman. Alternatively, the jurors may have concluded that, even though the three defendants might have been complicit in Robert Gentleman's alleged property damage, the State had failed to prove that the property damage attributable to Robert Gentleman equaled or exceeded $1000 in value. And finally, the jurors may have concluded that, because the State had proved its second and/or its third theory of vicarious liability, it was unnecessary for the jurors to decide whether the State had proved its first theory of vicarious liability, since the defendants would be responsible for property damage of considerably more than $1000 under either the State's second or third theories.

Because the jury's verdicts may have rested on the State's second or third theory of vicarious liability, and because the jurors did not receive the instructions they needed to properly evaluate those theories, we must reverse the defendants' convictions for third-degree criminal mischief.

*Our overall conclusion*

For the reasons explained in this opinion, the superior court's judgements against the three defendants are REVERSED.